CITY OF ST. LOUIS v. ST. LOUIS GASLIGHT COMPANY, *Appellant.*

1. **Corporations**: CONTRACT NOT ULTRA VIRES. The charter of the St. Louis Gaslight Company, a company incorporated for the purpose of supplying the city of St. Louis and its inhabitants with gaslight, provided that if, after twenty years from the 1st day of January, 1840, the city should resolve to purchase the gas-works from the company, or if, at such time, the city should decline to purchase, but, at the end of twenty-five years from said 1st day of January, 1840, the board of aldermen should then resolve to purchase, the company should sell and convey to the city their gas-works; provided, however, that the city should notify the company of its intention to purchase at either of the times prescribed, at least six months previous to the expiration of said terms of twenty and twenty-five years, respectively; and provided, further, that a failure to notify as provided should be deemed a refusal on the part of the city to purchase the interests of the company. If the city

should not resolve to purchase at either of the times prescribed, then the charter of the company should be in full force for an additional term of twenty-five years from and after the 1st day of January, 1865. The charter further provided, as follows: "The corporation of the city of St. Louis and the board of directors of the St. Louis Gaslight Company, may contract for and make regulations relating to the lighting of said city with gas, in such manner as may be agreed upon; and they may make generally such contracts in relation to the business of the company as may be beneficial to them and the public." In 1846 a contract was made between the city and the board of directors of the company, without the assent of the stockholders of the company, whereby the city relinquished the right to purchase the gas-works in 1860, and in lieu thereof obtained the right to purchase in 1870, or at the period of every five years thereafter, in the manner and upon giving the notice of intention to purchase provided in the charter. In 1869 the city resolved to purchase, and immediately gave the company notice as provided by the charter. In May, 1870, this suit was instituted by the city to enforce its right to purchase. The company denying the validity of the contract; *Held*, that the right conferred upon the city by the charter was simply a privilege of becoming the purchaser of the gas-works on the 1st day of January, 1860, or the 1st day of January, 1865, and the city was under no obligation to purchase at either of these times, but might exercise the privilege or not at its option; and the substitution of the right to purchase in 1870, or at the end of any five years thereafter, instead of 1860, was not *ultra vires*, but was authorized by the above quoted clause of the charter; *Held*, also, that the contract does not contravene the general rule that a board of directors of a corporation cannot sell out its business and property and thus defeat the object of its organization without the consent of the stockholders. The clause of the charter above quoted authorized the board to make any contract with the city which it might deem beneficial, and the result of this contract was absolutely to continue the business of the company at least five years; *Held*, also, that although the differing circumstances and conditions of the corporations in 1846 and 1860 might have been a reason why the city should not have relinquished in 1846 the right to purchase in 1860, it was a reason that addressed itself to the propriety and expediency of making such relinquishment, but did not affect the power.

Per NAPTON and HENRY, JJ. The contract of 1846 was invalid so far as it affected the right of the city, under the company's charter, to purchase in 1860 or 1865; no board of aldermen, prior to the times at which initial steps towards the purchase could have been taken under the charter, could waive the right of the city to purchase at such times.

2. **Corporations**: CONTRACTS: ESTOPPEL. In 1859 the city resolved to purchase the gas-works, and the company, on being notified of this action, refused to sell on the ground that under the contract of 1846 the city had no right to buy. Relying upon this assertion by the company of the validity of the contract of 1846, the city took no further steps in 1860 or 1865, but lost her right to purchase at both of said times in the belief that under the contract the validity of which the company had thus asserted, she would have the privilege of purchasing according to its terms on the 1st day of January, 1870, or at any period of five years thereafter; *Held*, that the company when sued in 1870, upon the contract of 1846, was estopped from asserting its invalidity.

3. **Equity will not Compel Specific Performance of Obligation to Arbitrate,** WHETHER GROWING OUT OF CONTRACT OR STATUTE; MANDAMUS. By the charter of the company and the contract of 1846, it was provided that the price to be paid by the city for the gas-works should be fixed by arbitrators, to be chosen by the city and the company in equal numbers, with an umpire, if necessary, to be selected by the arbitrators. In 1869, the city, having adopted a resolution to purchase, appointed arbitrators, and duly notified the company, but the company refused to appoint. This suit being instituted by the city to compel the company to sell at a price to be fixed by commissioners appointed by the court; *Held*, that the action would not lie; that it was an equitable proceeding to enforce specific performance of the contract of 1846, and the rule is well established that equity will not enforce specific performance of a contract of sale when the price remains to be fixed by arbitrators to be appointed by the parties; and the reason of the rule applies with even more force where the obligation to sell is of statutory origin. *Held*, also, that upon a proper case made, the company could have been compelled, by mandamus, to make the appoinment.

4. **Corporations**: CONTRACTS: CONSIDERATION: ULTRA VIRES. In 1873 a contract was entered into between the city, the St. Louis Gaslight Company and another gaslight company, by which it was agreed that the contract of 1846 should be canceled, and all suits pending between the parties should be dismissed, and all causes of action between them considered as settled. The contract further provided that the city should have two years time in which to pay an indebtedness then due from her to the St. Louis Gaslight Company. It also relinquished to the city the exclusive right of that company to make and vend gas in a certain district of the city, reserving, however, the right equally with other companies and individuals to carry on that business in said district. It also provided that said company should lay at least two and one-half miles of mains in each year, as the city might direct, without charge to the city, anything in the charter to the contrary notwithstanding. By the charter

the company had the right to charge the city 8 per cont. on the cost of pipe and laying the same, and the company was not bound to lay any pipe when the proceeds arising from the sale of gas would not be sufficient to defray the expense of furnishing the same.  In pursuance of this contract the company dismissed certain suits it was then prosecuting against the city.  *Held*, that the dismissal of these suits and the other concessions made by the company, constituted a consideration for the surrender, by the city, of its rights under the contract of 1846, and the agreement to dismiss the suits the city was then prosecuting, including the present, which, whether adequate in point of value or not, was sufficient in law.  *Held*, also, that the city did not, by the above mentioned resolution to purchase, appointment of arbitrators and notices given to the company, acquire a right to be treated in equity as the owner of the gas-works; and hence the contract of 1873 could not be impeached as *ultra vires* the city, on the ground that a municipal corporation cannot sell or dispose of property acquired for a public or governmental purpose.  *Held*, also, that the clause of the company's charter providing that the city and company " may make generally such contracts in relation to the business of the company as may be beneficial to them and the public," as it was sufficient to authorize the making of the contract of 1846, was also sufficient to authorize its cancellation.  *Held*, also, that the contract of 1873 was not *ultra vires* the company, as an attempt on the part of the company to absolve itself from the performance of a corporate duty, viz: the furnishing of gas to a portion of the city and its inhabitants; for the company only relinquished the right to exclude competition in the business of making and vending gas within that district of the city, and while the right to make and vend gas was a right conferred upon the company for the benefit both of the company and the public, and not for the sole benefit of either, the right to exclude competition was solely for the benefit of the company, and, therefore, one which, with the consent of its stockholders, it might surrender.

*Appeal from St. Louis Court of Appeals.*

The case is reported in vol. 5 Mo. App. Rep. 484.

REVERSED.

*Glover & Shepley, Noble & Orrick, Wagner, Dyer & Emmons, Willard P. Hall* and *Broadhead, Slayback & Haeussler* for appellant.

1. The contract of 1846 was not a valid contract, as construed in and by the decree, and the appellant is not estopped to deny its validity. It was *ultra vires* the city as construed. *Expressio unius est exclusio alterius.* *St. Louis v. Russell*, 9 Mo. 503; *Blair v. Perpetual Insurance Co.*, 10 Mo. 560; *Ruggles v. Collier*, 43 Mo. 353; *Matthews v. Skinker*, 62 Mo. 329; *H. & St. Jo. R. R. Co. v. Marion Co.*, 36 Mo. 303; *Western S. F. S. v. Philadelphia*, 31 Pa St. 185; *Bank of Louisville v. Young*, 37 Mo. 398; *Fowler v. Scully*, 72 Pa. St. 456; *First Nat. Bank v. Nat. Bank*, 92 U. S. 122; *Head v. Providence Ins. Co.*, 2 Cranch 127. Defect of power cannot be cured by agreement. *Houldsworth v. Evans*, 3 House of Lords Cases 263; *Ex parte Grady*, 9 Jur. (N. S.) 631; *Ry. Co. v. Ry. Co.*, 11 C. B. 775; *Bank of U. S. v. Dandridge*, 12 Wheat. 64; *Great Eastern R. R. Co. v. Turner*, L. R. Ch. App. 152. The expression of one way to act excludes power to act otherwise. Broom's Legal Maxims, (4 Ed.) p. 414; *North Stafford, &c., Co. v. Wood*, L. R. 3 Ex. 177; Dwarris on Stat., 655; *Maguire v. State Savgs. Ins.*, 62 Mo. 346; *Ex parte Snyder*, 64 Mo. 58; *U. S. v. 200 Barrels Whisky*, 95 U. S. 571; *Whitney Arms Co. v. Barlow*, 63 N. Y. 62; *N. W. U. Pkt. Co. v. Shaw*, 37 Wis. 655; *N. W. & M. P. R. R. Co.*, 7 Wis. 59; *Thompson v. Lambert*, 44 Iowa 239; *Thomas v. Richmond*, 12 Wall. 349; *City v. M. & W. Plank R. Co.*, 31 Ala. 76; *Penn., Del., &c., Co. v. Dandridge*, 8 Gill & John. 248, 319; *Albert v. Bank*, 1 Md. Ch. Decs. 407, 413; *Smith v. Alabama, &c., Co.*, 4 Ala. 558; *Hodges v. Buffalo*, 2 Denio 110; *Life, &c., Co. v. Mechanics, &c., Co.*, 7 Wend. 31; *N. Y., &c., Co. v. Fly*, 5 Conn. 560. The directors of the company could not agree to sell all its property and end its charter without the direct authority of its stockholders. *Abbot v. Am. Hard Rubber Co.*, 33 Barb. 578; *Colman v. Eastern Counties Ry. Co.*, 4 English Ry. Cas. 513; 10 Beav. 1; *Railway Co. v. Allerton*, 18 Wall. 235.

2. Specific performance of contract of 1846 cannot

be enforced, because price of property is to be fixed by arbitrators. *King v. Howard*, 27 Mo. 21; *Biddle v. Ramsey*, 52 Mo. 158; *Hug v. Van Burkleo*, 58 Mo. 202; *Street v. Rigby*, 6 Ves. 815; *Milnes v. Gery*, 14 Ves. 400; *Blundell v. Brettargh*, 17 Ves. 232; *Gourley v. Duke of Somerset*, 19 Ves. 429; *Agar v. Macklew*, 2 Sim. & Stu. 418; *Tobey v. County of Bristol*, 3 Story 820; *Morgan v. Birnie*, 9 Bing. 672; *Thurnell v. Balburnie*, 2 M. & W. 786; *Milner v. Field*, 5 Ex. 829; *Wilks v. Davis*, 4 Merivale 507; *Darbey v. Whittaker*, 4 Drewry 134; *Morgan v. Milman*, 3 DeGex, McN. & G. 24; *Norfleet v. Southall*, 3 Mur. 189; *Graham v. Call*, 5 Munf. 396; *Conner v. Drake*, 1 Ohio St. 166.

3. The right of appellant to its franchise and property did not become vested in the respondent by the resolution and notice, as of the date decided, January 1st, 1870. It was necessary that the price of the property to be conveyed should have been ascertained and fixed and paid, or offered to be paid, before the title would vest in the purchaser. *Klyce v. Broyles*, 37 Miss. 524; *Mhoon v. Wilkerson*, 47 Miss. 633; *Hoen v. Simmons*, 1 Cal. 119; *Green v. Covilland*, 10 Cal. 317, 323; *Goodale v. West*, 5 Cal. 317, 323, 339; *Marshall v. Caldwell*, 41 Cal. 611; *Mather v. Scoles*, 35 Ind. 1; *Hart v. McClellan*, 41 Ala. 251; *Rogers v. Taylor*, 40 Iowa 193; *Fall v. Hazebrigg*, 45 Ind. 576; *Hamilton v. St. Louis Co.*, 15 Mo. 3.

4. The tripartite agreement of 1873 was for a valuable consideration, as shown on its face and proven in this case, which the city has received and enjoyed. It was in compromise of disputes and such as a municipal corporation could make. 1 Dillon on Corp., 308; *Petersburgh v. Mappin*, 14 Ill. 193; *Supervisors v. Bowen*, 4 Lansing 24; *Alex. Canal Co. v. Swann*, 5 How. 89. It was not *ultra vires* the appellant. It does not exclude the appellant from any portion of the city, but surrenders merely an exclusive privilege; and this exclusive privilege was abandoned in a legal and binding manner; by consent of all stockholders; by allowing the Laclede to occupy the territory;

by inducing the Laclede to build there and expend great sums in its works, and by the contract, which has been practically construed by the parties. *St. Louis Gas Co. v. St. Louis*, 46 Mo. 127. The exclusive right was abandoned legally and bindingly. *Rundell v. Murray*, Jacob 311, 316; *Saunders v. Smith*, 3 Mylne & C. 711, 728, 730, 735; *Fremont Ferry Co. v. Dodge Co.*, 6 Neb. 18; s. c., 3 Law & Eq. Rep. 680; *Wyeth v. Stone*, 1 Story 284. It is not an attempt by appellant to avoid its public duty or abandon its franchise. 1 Redfield on Railways, p. 676, § 155, § 4; *People ex rel. Green v. D. & C. R. R. Co.*, 58 N. Y. 155; *Bowman v. Wathen*, 2 McLean 376, 393; Pierce on Railways, 529; Angell & Ames on Corp., § 191; *People v. Manhattan Gas Co.*, 45 Barb. 136; *Hays v. O. & O. Ry. Co.*, 61 Ill. 165, 422; *Black v. Delaware Co.*, 24 N. J. Eq. (7 C. E. Green) 455; *Oakland, &c., Co. v. O., &c., Co.*, 45 Cal. 365; *Shepard v. Milwaukee Gaslight Co.*, 6 Wis. 539. Nor does it give place to an unauthorized party; it reserves the right to all, itself included, to sell gas in territory north of Washington avenue, and as it abandons only its exclusive privilege, the Laclede Gaslight Company comes in by force of its own charter. Green's Brice's *Ultra Vires*, 311, 312, 313, 336 n; *R. R. Co. v. R. R. Co.*, 5 McLean 450; *Stanton v. Allen*, 5 Denio 434. State has control. *Munn v. Illinois*, 94 U. S. 113; *Chicago, B. & Q. R. R. Co. v. Iowa*, 94 U. S. 155.

*Leverett Bell, W. B. Thompson, H. A. Clover, L. Gottschalk, Philips & Vest, Henderson & Shields* for respondent.

1. The contract of 1846 was a valid contract. Express power was granted to the city and company to make such a contract. Sess. Acts 1838, p. 244, § 13. This contract did not confer upon the city the power to purchase the works; the power was granted by the charter of the company. The times provided therein for the purchase were directory only; were not essential to the exercise of

the power, and could be waived or changed by agreement of the parties. Pomeroy Spec. Per., § 418; Hilliard Vend., 196, 201; *Rector v. Price*, 1 Mo. 373; *Ewing v. Gordon*, 49 N. H. 461; *Snordman v. Harford*, 55 Me. 197; *Lee v. Tillotson*, 24 Wend. 339; *Baker v. Braman*, 6 Hill 47; *Viele v. German Ins. Co.*, 26 Iowa 10; *Willston v. Willston*, 41 Barb. 643; *Benedict v. Lynch*, 1 Johns. Ch. 370; *Sharp v. Trimmer*, 9 C. E. Green (24 N. J. Eq.) 422; *Wood v. Griffith*, 1 Swanton 56; *Morse v. Merest*, 6 Madd. Ch. 25.

2. The defendant, by the execution of the contract of 1846, and its acts under said contract, is estopped from denying its validity, and if the power of the city to purchase the gas-works shall rest upon the contract of 1846, being executed in pursuance of the charter, then the right of the city to purchase the property is ample and secure by the estoppel asserted against the defendant. *Zabriskie v. Cleveland R. R. Co.*, 23 How. 381; Ang. & Am. on Corp., § 240; Sedgwick on Stat. & Const. Law, § 240; Cooley Const. Lim., §§ 73, 254; *Rumsey v. People*, 19 N. Y. 46; *People v. Maynard*, 15 Mich. 470; *Hoyt v. Quicksilver Mining Co.*, 24 N. Y. S. C. Rep. 170.

3. The passage of the resolution to purchase, and the notice given defendant at the time and in the manner provided, entitled the plaintiffs to a specific performance of the contract as provided by the charter, and such relations existed by operation thereof, that either party could insist upon a full and exact performance of the contract and the execution of the law. *Ogden v. Sander*, 12 Wheat. 259; *Keen v. Bristol*, 26 Pa. St. 46; *Paris v. Haley*, 61 Mo. 453; Fry on Spec. Perf., § 23; 1 Story Eq. Jur., §§ 780, 789; *Green v. Smith*, 1 Ark. 572; *Huffman v. Hummer*, 17 N. J. Eq. 263; *King v. Buckman*, 11 N. J. Eq. 599; *Richter v. Selin*, 8 Serg. & R. 440; *Siter's Appeal*, 26 Pa. St. 178; *Colson v. Thompson*, 2 Wheat. 336; *Kendall v. Amy*, 2 Sumner, 278; *Biddle v. Ramsey*, 58 Mo. 203; *Steevens Hospital v. Dyas*, 15 Irish Ch. 405; *Gas Co. v. Wheeling*, 8 W. Va. 320; *Ammant v. N. A. & P. T. Co.*, 13 Serg. & R.

City of St. Louis v. St. Louis Gaslight Company

210; 9 Watts & S. 27; *Winch v. Birkenhead R. R. Co.*, 5 DeGex & Sm. 562; 13 Eng. L. & Eq. 508; *Black v. Delaware & Raritan R. R. Co.*, 24 N. J. Eq. (9 C. E. Green) 455; *Shepard v. Milwaukee Gas Co.*, 6 Wis. 539; *City of St. Louis v. St. Louis Gas Co.*, 4 Mo. App. 484, 529; Green's Drice's *Ultra Vires*, 305, 372. And the sale or transfer of the powers of one company to another, without the authority of the Legislature is against public policy; and the courts will do nothing to promote the transfer, as it is in utter disregard of the duties and obligations of the company. *Hays v. O. O. & F. R. V. R. R. Co.*, 61 Ill. 422; *Copeland v. Citizens Gaslight Co.*, 61 Barb. 76. Nor can franchises be dissevered or divided except by legislative authority. *O. R. R. Co. v. O. B. & F. B. R. R. Co.*, 45 Cal. 365; *People v. Albany & Vermont R. R. Co.*, 24 N. Y. 261; *Thompson v. People*, 23 Wend. 584. The St. Louis Gaslight Company abandoned its franchises so far as the territory conceded to the Laclede Gaslight Company was yielded by it, suspended its business therein and neglects its corporate duty there. This it could not do. *Abbot v. Am. Hard Rubber Co.*, 20 How. Pr. 199; 21 How. Pr. 193; *Conro v. Port Henry Iron Co.*, 12 Barb. 27; *Beman v. Rufford*, 1 Sim. (N. S.) 550; 6 Eng. L. & E. R. 106; *Johnson v. Shrewsbury & Pa. R. R. Co.*, 3 DeGex, McN. & G. 914; *Shrewsbury & Birm. R. R. Co. v. N. W. R. R. Co.*, 6 H. L. C. 113, 131; 1 Sim. 110; *S. Yorkshire R. R. Co. v. Gr. N. W. R. R. Co.*, 3 DeGex, McN. & G. 576; *Gr. Mid. R. R. Co. v. East Counties R. R. Co.*, 9 Hare 306; *Troy & Rut. R. R. Co. v. Kerr*, 17 Barb. 601; *Ohio & Miss. R. R. Co. v. Ind. & Cin. R. R. Co.*, 5 Am. Law Reg. (N. S.) 733.

4. This contract of 1846, and the provisions of the charter of the defendant only provide for the appointment of arbitrators to fix a fair price, and the mode of accomplishing the end by arbitrators was not essential to the validity of the contract, and in all such cases it may be done without the appointment of arbitrators. Fry on Spec. Perf. § 217; *Lumley v. Wagner*, 5 DeGex & Sm. 485;

1 DeGex, McN. & G. 604; *Rigby v. The Great W. R. R. Co.*, 2 Phil. 44; *Paris Chocolate Co. v. Crystal Palace Co.*, 3 Small & Gif. 119, 124; *Stocker v. Wadderburn*, 3 K. & J. 393; *Green v. Low*, 22 Beavan 625; *Morse v. Merest*, 6 Madd. Ch. 27; *Biddle v. Ramsey*, 58 Mo. 203; 52 Mo. 153; *Milnes v. Gery*, 14 Ves. Jr. 407, 403; *Brodie v. St. Paul*, 1 Ves. Jr. 326; *Wood v. Griffith*, 1 Sw. 53, 55; 18 Ves. 429; *Gas Co. v. Wheeling*, 8 W. Va. 367, 448, 320; *Tscheider v. Biddle*, 4 Cent. Law Jour. 323; 4 Dillon 56; *Arnot v. Alexander*, 44 Mo. 25; *Strohmaier v. Zeppenfeld*, 4 Cent. Law Jour. 382; *Hug v. Van Burkleo*, 58 Mo. 202; *Kelso v. Kelly*, 1 Daly 419; *Viany v. Ferran*, 54 Barb. 530; *Graham v. James*, 7 Robertson (N. Y.) 468; *Hopkins v. Gilman*, 22 Wis. 476; *Gaskarth v. Lord Lowther*, 12 Ves. 107; *Wilks v. Davis*, 3 Mer. 507; *City of Providence v. St. John's Lodge*, 2 R. I. 46; *Dike v. Greene*, 4 R. I. 285; *Richardson v. Smith*, L. R. Ch. 648.

5. The contract of 1873 was void because *ultra vires*, without consideration and against public policy. Privileges granted to corporations are conferred with a view to the public use and accommodation; they cannot give up to others their special powers or the control of their undertakings. *Lamman v Leb. Val. R. R. Co.*, 6 Casey 42; *York & Md. R. R. Co. v. Winans*, 17 How. 39; *Com v. Smith*, 10 Allen 455; *Richards v. Libby*, 11 Allen 66; *Zabriskie v. Hackensack & N. Y. R. R. Co.*, 3 C. E. Green 183; *McGregor v. Official Managers, &c.*, 18 Q. B. 618; *Hart. & N. Haven R. R. Co. v. N. Y. & N. H. R. R. Co.*, 3 Rob. 411; *Hays v. O O. & F. R. V. R. Co.*, 61 Ill. 422; *Stanton v. Allen*, 5 Denio 434; *Shrewsbury & Birm. R. R. Co v. N. W. R. R. Co.*, 22 L. J. Ch. 682. Not even with the assent of all the stockholders. *East Anglian Ry. Co. v. Eastern Co. Ry. Co.*, 11 C. B. 775.

NORTON, J.—This suit was instituted in the circuit court of St. Louis county on the 21st day of May, 1870. An amended and supplemental petition was filed, by leave of court, on the 4th day of August, 1875, in which the La-

clede Gaslight Company was made a party defendant, and upon this amended petition the cause was tried in the circuit court, which resulted in a decree for plaintiff, from which an appeal was prosecuted to the St. Louis court of appeals, where, upon a hearing, the decree of the circuit court was in all things affirmed, from which latter judgment defendant prosecutes its appeal to this court.

It is alleged in the petition that defendant was incorporated by an act of the General Assembly approved February 4th, 1837, and was thereby vested with power to erect works in the city of St. Louis for supplying pure inflammable gas and the necessary apparatus for lighting said city and its suburbs with gas; and that said city was empowered to purchase, hold and convey any estate, real or personal, for its use; that said charter was amended by act of the Legislature approved February 11th, 1839, which was immediately thereafter accepted and ratified by the stockholders, as provided therein; that said act of incorporation was further amended by an act approved February 28th, 1845. The petition further alleges that defendant duly organized under said original act and the acts amendatory thereof, and acquired certain real estate on which it erected its works, &c., particularly describing the real estate and other property thus acquired; that, by the acts incorporating the company, it is provided that if, after twenty years from the 1st day of January, 1840, the corporation of the city of St. Louis shall resolve to purchase the gas-works from the St. Louis Gaslight Company, the price shall be fixed by arbitrators, one or more to be chosen by the president and directors of the company, and an equal number by the aldermen of the city, the arbitrators to take into consideration the value of the gas-works and the lands, grounds, buildings and utensils, rights and interests, and everything thereunto pertaining; and if they agree, their award shall be binding; to the amount agreed upon shall be added seven per cent. on the valuation, which aggregate amount shall be paid by the city to the company

in full consideration for the works, lands, grounds, building, interests, rights, &c., belonging to the gas company. It is also alleged that it was further provided that if the city declined to purchase at the end of twenty years, then the company shall, at the end of twenty-five years from the 1st day of January, 1840, and provided the board of aldermen then resolve to purchase the same, sell and convey to the city their estate interest and title to the gas-works, in manner above provided, except that to the valuation shall be added only five per cent. advance, which shall be paid in full consideration of the works; provided that the corporation of the city of St. Louis shall notify the president and the directors of the company of its intention to purchase at either of the times prescribed at least six months previous to the expiration of said terms of twenty and twenty-five years respectively.

Certain other provisions of the charter were set out, to-wit: That the charter should continue in force for twenty-five years from the 1st day of January, 1840, unless the company should convey to the city of St. Louis its gas-works, property, &c., in which event the gas-works, property, &c., should vest in the city and the charter of defendant should cease and determine; but should the city not determine to purchase at either of the times provided for, then the act of incorporation to remain in force for an additional term of twenty-five years from the last date mentioned for the sale and purchase; and further, that by the amendatory act of 1839 it was provided that the city of St. Louis and the board of directors of the gas company may contract for and make regulations relating to the lighting of the city with gas in such manner as may be agreed upon, and may make generally such contracts in relation to the business of the company as may be beneficial to them and the public.

The petition further states that plaintiff and defendant, on the 9th day of January, 1846, made a contract in writing, in the fifth clause of which the plaintiff relin-

quished the right to purchase the gas-works, &c., at the end of the twenty years from the 1st day of January, 1840, as provided in the twenty-seventh section of said charter; provided that in case the plaintiff declined to purchase the gas-works at the end of twenty-five years from the 1st day of January, 1840, as provided for in the incorporating acts, the plaintiff should have the privilege of purchasing at the end of thirty years from the 1st day of January, 1840, and at the period of every five years thereafter, in the manner as provided in the charter, and upon giving notice as provided in the charter. The petition further avers that the city of St. Louis, by its city council, did, on the 20th day of February, 1869, adopt a resolution resolving that it would purchase the gas-works, and requesting the mayor of the city to notify the president and directors of said defendant of the intention of the city to purchase the same at the time prescribed by law, to-wit: On the 1st day of January, 1870, and that on the 27th day of February the president and directors of the gas company were duly notified of the adoption of the resolution; that thereafter, on the 26th day of November, 1869, the city of St. Louis appointed three arbitrators, qualified as provided by the charter, to act in conjunction with the same number to be chosen by the defendant in fixing the price and value of the gas-works, &c., as specified in the charter and in the contract of January 9th, 1846, of which the defendant was duly notified on the 1st day of December, 1869; that the arbitrators chosen by the city appeared at the time and place appointed on December 4th, but the defendant failed and refused to appoint arbitrators, and denied the validity of the clause in the contract which provides for the purchase on or after January, 1870.

The petition also avers that defendant ought not to be heard in averring that the contract of 1846 was invalid, because the clause authorizing the purchase on the 1st day of January, 1870, was inserted therein, at the instance of defendant, for the fraudulent purpose of inducing the

plaintiff to forego said purchase, at either of the times mentioned in the charter, on the belief that it had the right to purchase, and defendant would sell on the 1st day of January, 1870, or any period of five years thereafter, as provided in said contract; that plaintiff, on the faith of said contract, did forego the right to make said purchase at either of the times mentioned in the charter of defendant; that under a contract made between plaintiff and defendant on the 8th day of January, 1841, penalties had accrued which defendant owed plaintiff, amounting in the aggregate to $100,000, all of which were released and discharged by the contract of 1846, and that it would be against equity to permit plaintiff to assert the invalidity thereof.

It further alleges the incorporation of the Laclede Gaslight Company, and that it was authorized by various acts of the Legislature to vend gas within the corporate limits of the city, and to establish and lay pipes, mains, &c., necessary for that purpose; that a controversy arose between the two gas companies as to the right of the Laclede Gaslight company to exercise the above privileges, the St. Louis Gaslight Company disputing such right, and claiming that the exclusive right of making and vending gas belonged to it; that this controversy was, in 1872, compromised, under the terms of which the Laclede Gaslight Company undertook to purchase the pipes, mains, &c., of the St. Louis Gaslight Company north of a line coincident with the south line of Washington avenue, and the St. Louis Gaslight Company abandoned its exclusive right to manufacture gas in that part of the city, and the manufacture and sale of gas therein was undertaken by said Laclede Gaslight Company. It is then alleged that said companies for the purpose of effecting and carrying out said compromise, caused an ordinance to be prepared and submitted, on the 10th day of February, 1873, to the city council of St. Louis, which on that day was adopted, and is entitled "An ordinance to provide for the better lighting of St.

Louis with gas, for the reduction of the price of gas, for the settlement of litigation between the city and the St. Louis Gaslight Company, to provide for the establishment of an additional gas company in the city of St. Louis, and for controlling the quality and standard of gas and gaslights for the city, and to repeal article 5, of chapter 13, of the revised ordinances of 1871." It is then alleged that on the 28th day of February, 1873, the precise terms and language of the ordinance were embodied in a contract of three parts, which was sealed, executed and delivered by and between the city of St. Louis of the first part, the Laclede Gaslight Company of the second part, and the St. Louis Gaslight Company of the third part. The ordinance and contract are fully set out in the petition, but we will only insert here such provisions as we deem to have a material bearing on the questions involved.

The first section of the ordinance provides that the St. Louis Gaslight Company waives, abandons and surrenders forever, to the city of St. Louis, irrevocably, any and all claim, and pretense of claim, of exclusive right to have gas-works, lay or have pipes or other appliances, vend or furnish gas, or do business as a gas company in said city north of Washington avenue, and the St. Louis Gaslight Company covenants and agrees with the said city and the Laclede Gaslight Company that it will not, within said district or portion of the city, at any time assert any claim or right to hinder or prevent the erection or completion of any gas-works or the laying down of mains, pipes or other things, or furnishing or supplying the city and its inhabitants, by any gas company or private individual; and that no suit shall ever be commenced, nor any act or thing be done by the St. Louis Gaslight Company to hinder or molest the Laclede Gaslight Company, or any other gas company or private individual, in erecting, having or using the works, pipes and appliances for carrying on the business of a gaslight company, and furnishing gaslights in the aforesaid portion or district of said city, so that both of

said gas companies, or any other gas company or private individual, shall be permitted to exist and do business in the aforesaid district, or portion of said city, without hindrance.

2. The Laclede Gaslight Company and the St. Louis Gaslight Company, each and both of them, further covenant and agree with the city of St. Louis that each one of said companies shall act only under its own charter and franchises; that each shall have its own property and manage and prosecute its own separate business under its own charter and franchises, but the Laclede Gaslight Company abandons and surrenders fully and completely any and all exclusive rights and all claims, or pretense of claims, of sole or exclusive privilege or right of lighting any part of the city of St. Louis with gas, or making or vending gas, gaslights or gas fixtures, and all sole or exclusive right whatsoever, whether claimed under its charter or by the aforesaid surrender to it or otherwise; such surrenders and abandonments by both companies to be done and effected in a legal and binding manner. It being hereby understood and agreed that the district and portion of said city which is to be occupied by the Laclede Gaslight Company, and for and within which it herein contracts to furnish gas and do other things herein contracted for by it is, and shall be, the district aforesaid, all north of said line above described; and that the district and portion of said city which is to be occupied by the St. Louis Gaslight Company, and for and within which it herein contracts to furnish gas and do all other things herein contracted for by it, is and shall be the remainder or balance of said city, so far as the charter of said St. Louis Gaslight Company extends and authorizes.

The third clause provides for the appointment of a gas inspector, the payment of his salary by the two companies, and prescribes the duties to be performed by him.

The fourth provides for the quality of the gas to be furnished, and the method of testing it, and that the price

of gas furnished shall not exceed $3.25 per 1,000 cubic feet, and that it shall be further reduced as coal may be reduced in price. It also contains the following: "Each of said gas companies further agrees that the city may require the laying and placing of additional mains, with all necessary and proper connections, in each year, to an amount and extent by each company of two and a half miles of mains, being in all five miles in each year, to which amount and extent each of said gas companies respectively shall be bound to furnish and lay the same, if required. And in case the city shall not, in any one year, require the laying or placing of the amount of five miles of mains or pipes as aforesaid, then it may require the laying or placing of mains or pipes of succeeding years for any deficiency to each company; so that the said city may require the laying and placing of such mains and pipes to an extent not to exceed an average of five miles per year; being an average of two and a half miles per year during this contract to each gas company. And the city shall have the right to order the erection of any and all lamps it may desire at all places where the mains are laid, or as fast as they shall be thereafter laid; but no charge is to be made against said city, nor is any payment to be made by it for or on account of any mains, pipes, lamps, lamp-posts or other works or erections made by either of said gas companies— said city only to pay for the gas used by it on the terms herein stated, anything in the charter of either of said gas companies to the contrary notwithstanding.

The fifth and sixth clauses relate to supplying and keeping in repair lamps, lamp-posts, burners, &c., and to the payment for gas furnished public lamps.

The seventh clause is as follows: It is further covenanted and agreed by and between said parties that this contract shall continue in force until the 1st day of January, 1890, or so long during that period as both of said gas companies shall exist and continue to do business as gas companies in the city; and it is further agreed between the

said city and the St. Louis Gaslight Company that the litigation between them shall cease; all suits pending between them are to be dismissed, and all causes of action between them to be considered as settled; and the bills of the St. Louis Gaslight Company against the city for gas heretofore furnished to the city under the contract of date January 9th, 1846, with interest at six per centum per annum until paid, are to be and will be paid by the city as follows: The city is to have two years from and after the 1st day of July, 1873, for such payment, but it may make payment of any part thereof at any time within said two years, or may pay the amount then due thereon at any time within said two years, in six per cent. gold bonds of the city, at their current or market value. And this contract and agreement is a substitute for and in lieu of said contract of date January 9th, 1846, between the city and the St. Louis Gaslight Company, and which last named contract is to be canceled by the parties thereto, and each and both parties to be absolved therefrom.

The petition then alleges that the said ordinance and contract entered into thereunder were and are illegal and void; that the contract was without consideration, and that neither the city nor defendant had lawful authority to make it. The petition concludes with the following prayer: That the court compel the St. Louis Gaslight Company to appoint arbitrators to fix the value of the gas-works, &c., or that the court will appoint referees or commissioners to fix that value; that the rights or claims of the Laclede Company to any portion of the property may be ascertained and the price which the plaintiff ought to pay being determined "that the plaintiff be allowed," as it offers to do, "to pay the same to the defendants," as they may be respectively entitled to the same, or into court, and that the St. Louis Company be compelled to convey the works, property, &c., to plaintiff, and the pretended right of the Laclede Company to any part thereof "may be extinguished," and that the court will, by its decree, pass the

title and possession to the plaintiff; that the court may order an accounting of the rents and profits of the gas-works and property which have accrued since January 1st, 1870; that the net balance thereof over expenses and interest on the value of the gas-works may be decreed to be paid plaintiff; that the St. Louis Company may be enjoined from further business, and a receiver appointed to take charge of the gas-works and property in possession of either of the defendants, and carry on the business until the further order of the court, and for general relief.

On the 14th day of January, 1876, the defendant filed its separate answer, in which it avers that plaintiff is a municipal corporation with limited powers, admits that defendant was incorporated under acts of the General Assembly mentioned in the petition, and refers to said acts for the extent of its powers; admits that it was the owner of the property mentioned, but avers that all the said lands or lots, or the buildings thereon, were not the gas-works of defendant; and admits that all the personal property was necessary, as alleged. It denies the agreement of 1846 in the form stated, and avers that the fifth clause of the alleged contract was at no time submitted to or authorized by the stockholders of defendant; and that so far forth as said terms and conditions existed, the same were beyond the power of defendant to make, without the authority of stockholders; and avers that the plaintiff was without power to make or enter into any agreement such as is in the fifth clause contained. The answer then says that all the terms of the contract of 1846 are not set forth in the petition, nor is defendant given an opportunity to take issue thereon; that there were other terms binding upon it, affecting the fifth clause, to have been performed by the plaintiff before any right at law or in equity could accrue to it by virtue of said fifth clause, but which plaintiff has failed at all times prior to the commencement of this suit and prior to the filing of said amended petition, to perform, and which plaintiff still fails to keep and perform. The answer next

makes some special denials as to the appointment of arbitrators, notice, &c.

Defendant then particularly avers that since said alleged appointment of arbitrators, and since the commencement of this suit, the plaintiff has waived all right to purchase said gas-works, on the 1st day of January, 1870, and has continued to treat the defendant as proprietor, and has paid defendant sums of money, to-wit: as proprietor and owner of the gas-works for gas furnished plaintiff. Defendant denies that the clause in relation to the purchase, by plaintiff, on or after January 1st, 1870, was inserted in the contract of 1846, at the instance of defendant, or for the fraudulent purposes averred, or that plaintiff, for any reason alleged, did forego its right to make purchase at either of the times mentioned in the charter, or that plaintiff would have purchased at either of those times if it had not relied upon the agreement stated, and denies that any penalties had accrued under the contract of 1841, and denies the compromise alleged between the defendant companies. It denies that the defendant prepared or presented an ordinance to the city council, as alleged, but admits that the ordinance set forth in the amended petition was passed by the city council and approved by the mayor in due form, and admits and avers that on February 28th, 1873, a contract in three parts, drawn up in accordance with the ordinance recited by the plaintiff, and embodying the precise terms and language of the said ordinance in all particulars, was sealed, executed and delivered by and between the said city of St. Louis, the Laclede Gaslight Company and the St. Louis Gaslight Company, as stated in the amended petition, and that a copy is annexed and made part of the answer. Defendant denies the illegality thereof, and sets the same up, and says that by virtue of the seventh clause it was agreed, among other things, between the city and the St. Louis Gaslight Company, that the litigation between them should cease, all suits pending between them should be dismissed, and all causes of action between them

should be considered as settled; and that said contract and agreement were to be substituted for and in lieu of said contract dated January 9th, 1846, which last named contract was to be canceled and the parties absolved therefrom; and the defendant says, that all things on defendant's part and on the part of the other parties thereto to perfect said agreement to be performed, were duly performed; that the defendant dismissed all suits by it then pending against the plaintiff, and in all things performed the agreement on its part, and that there were no provisions in said agreement affecting materially the said seventh clause; and that the plaintiff's alleged cause of action, "if any ever existed," has been, and is now, by said last named agreement, compromised, settled, adjusted and extinguished, and that this action can no longer be by the plaintiff legally prosecuted, and should be dismissed; that the contract of 1846 was and is canceled, and the parties absolved therefrom. The answer then avers that in pursuance of the agreement of February 20th, 1873, the St. Louis Gaslight Company entered into a subordinate agreement with the Laclede, whereby the latter undertook to supply and furnish gas of requisite quality and sufficient quantity to the city of St. Louis for public lamps and to private consumers in the district alleged; and that the Laclede hath at all times so supplied that portion of the city, and denies that defendant has abandoned its right to furnish gas for the said city or its suburbs; and says whenever any portion of the city or suburbs are not supplied, that it stands ready to do so.

The answer then avers that the plaintiff ought not to be allowed to allege anything against the contract of 1873, because it was made at the request of the plaintiff, and the plaintiff has received great benefit and profit thereunder, and the defendant has been put to great expense; that defendant has been induced thereby to waive its exclusive right over a large part of the city, and to dispose of large parts of its property, which, should said agreement be set aside, would become again necessary to the defendant to be

regained, if at all, under and at great loss; and because defendant, at the special instance of the plaintiff, did dismiss several actions for large sums of money against the plaintiff, which suits cannot now be reinstated; and because plaintiff and defendant have gone on, since the execution of said last agreement, to duly perform each its various obligations and enjoy its rights, whereby plaintiff has been greatly and pecuniarily benefited, and defendant hath been put to great labor and expense, and defendant hath been induced thereby to part with valuable rights, privileges and property it could not otherwise have parted with or disposed of. The answer then avers that the plaintiff ought not to be allowed to assert aught against the agreement of 1873, because at the time of its negotiation and execution the city was a stockholder of defendant to the amount of 200 shares, and advised and consented to its execution, and, as such stockholder, has, from time to time, with full knowledge, accepted dividends of profits from time to time, which sums plaintiff still retains; and that the defendant, with the knowledge of the plaintiff as a stockholder, and induced by said agreement and the belief that the plaintiff would perform, hath parted with and disposed of a large part of its personal property lying north of Washington avenue, and hath received therefor large sums of money, which, at the instance of the plaintiff and other stockholders, defendant hath divided among its shareholders, and the plaintiff hath accepted and received, and still retains, large sums of money so obtained; that the plaintiff hath, by its action under said agreement, received large profits, and hath subjected the defendant to great loss if said agreement is not sustained; and the defendant asks that plaintiff may be restrained from further setting up said contract of 1846, and particularly the alleged privilege to purchase defendant's works; and the defendant asks for general relief. Plaintiff, in its replication, denies all new matter set up in the answer. We have

omitted the answer of the Laclede Gaslight Company since plaintiff dismissed, as to it, by leave of court.

On the 1st day of June, 1876, the court, having heard the evidence, rendered an interlocutory decree to the following effect: that the contract of January 9th, 1846, was valid, and under it and the charter the city had the right to purchase defendant's gas-works on the 1st day of January, 1870; that defendant had refused to appoint arbitrators under the resolution and notice to fix the value of the gas-works; that the contract ought to be specifically enforced; that defendant should be held to account for all sums realized in the operation of the works from the 1st day of January, 1870; declares the ordinance of February 10th, 1873, as well as the contract of February 28th, 1873, to be invalid, and that it cannot be set up to defeat plaintiff's right of recovery; appoints a receiver to take possession of the property, and three commissioners to ascertain its value, as of the 1st day of January, 1870, and the profits realized from operating the works; and restrains and enjoins defendant from manufacturing or selling gas. Under this decree the receiver took possession of the property, and the commissioners proceeded to fix the value of the same and ascertain the profits derived from operating the works. On the 12th day of February, 1877, the report of said commissioners coming on to be heard; the court rendered its final decree, confirming the interlocutory decree and the report of the commissioners, except as modified by the decree. The court then, after finding the value of the gas-works and coal and gas on hand on the 1st day of January, 1870, the receipts from the operation of the works from that time to the 5th day of June, 1876, the expenditures in their operation during the same time, the indebtedness of the city to the defendant for gas furnished under the contract of 1846, the amount received by the defendant from the sale of gas-works property to the Laclede Company, decreed that the matter in controversy should be

adjusted on the following basis, viz: that the St. Louis Gaslight Company should be debited as follows:

St. Louis Gaslight Company, Dr.

Total receipts from January 1st, 1870, to June 5, 1876, $5,412,360.35.

Also with money received from the Laclede Gaslight Company, $655,000; amounting in the aggregate to $6,067,-360.35; and shall be credited as follows:

1. Value of defendant's gas-works January 1st, 1870, $1,643,742.16.

2. Expenditures from January 1st, 1870, to June 5th, 1876, $3,506,403.35.

3. Value of coal and gas on hand January 1st, 1870, $115,533.95.

4. Amount due to defendant from plaintiff March 1st, 1873, for gas furnished under said contract of January 9th, 1846, being $674,908.80.

5. Amount due from defendant to plaintiff for gas furnished from December 6th, 1875, to June 5th 1876, $62,922.34.

6. Dividends paid to plaintiff by defendant from January 1st, 1870, to June 5th, 1876, $23,800.00—making total of credits, $6,023,310.60.

The court then decrees that the last named amount should be paid by deducting it from the amount named on the debit side, and then proceeds to render judgment for plaintiff for the sum of $40,049.75, that being the remainder after such deduction; and divests defendant of all right and title to the gas-works property, and vests the same in plaintiff. This judgment rendered, on appeal to the St. Louis court of appeals, was affirmed, and is before us on appeal from the judgment of affirmance.

We do not deem it necessary to state or notice all the numerous grounds of error assigned by the defendant's counsel, and shall, therefore, confine ourselves to a consideration of those only which we think have a material bearing on the rights of the parties. The most important of

these are that the court erred in holding the contract of January 9th, 1846, to be valid, and that, if originally invalid, defendant was estopped from asserting it; also, in holding that said contract could be specifically enforced, and in divesting defendant by its decree of all title to the property in dispute, and·vesting the same in plaintiff; that it also erred in holding that the ordinance of February 10th, 1873, and the contract of February 28th, 1873, were invalid, and that plaintiff was not estopped from asserting their invalidity.

The validity of the contract of January 9th, 1846, is, therefore, the first material question presented for our consideration.    Its validity is assailed by defendant's counsel on two grounds: First, That the city had no legal authority to enter into it; Second, That defendant's board of directors, in making it, went beyond their powers; that the stockholders had neither authorized the contract to be made, nor ratified it after it was made.

*1. CORPORATIONS: contracts not ultra vires.*

The contract in question is between a private corporation, on the one side, and a municipal or·public corporation on the other, and unless the authority of each to make it has been conferred by some law either in express terms or by necessary implication, it cannot stand.    It being a well-settled principle that such corporations can only contract as they may be authorized by some statute, this necessarily leads us to an examination of said contract, an ascertainment of its scope and legal effect, as well as to a construction of the acts of incorporation which·are supposed to confer the power to make it, before its validity can be tested by the principle above announced:.    For the purpose of construing it and ascertaining its legal·effect, we quote sections 5 and 6 of said contract, which have given rise to the present proceeding.    They are as follows:

5.    The party of the first part (the city) agrees and does hereby relinquish the right to purchase the gas-works property, &c., of the gaslight·company at the expiration of

twenty years from and after the 1st day of January, 1840, as provided for by the 27th section of the charter of said company; provided, that in the event the said party of the first part shall decline to purchase the gas-works, property, &c., at the end of twenty-five years from and after the 1st day of January, 1840, as is provided in the 28th section, it shall have the privilege of purchasing as aforesaid at the end of thirty years from and after the 1st day of January, 1840, and at the period of every five years thereafter, in the manner as is provided in the 27th and 28th sections, and upon giving notice of intention so to purchase, as is provided in section 28 of said charter.

6.   That whenever the said party shall have resolved on a purchase of the gas-works, property, &c., of the gaslight company, as provided for by the 28th section of the charter of said company, or as provided for by the preceding 5th section of this contract, the abitrators chosen in accordance with the provisions of the 27th section of said charter shall take into consideration only the value of the gas-works and the lands, grounds, buildings, utensils and appurtenances belonging exclusively to said works; all privileges, rights and interests conferred by said charter, except the privilege of lighting the city with gas, as also all property and effects not necessarily connected or appertaining to the gas-works, being reserved to the said gaslight company.

It is a familiar principle that when a contract in writing refers to another instrument of writing as part of it, the contract should be read as if the writing referred to had been literally copied in it, as a part thereof, the reference being used simply to guide the mind to the writing referred to, and authorizing its interpolation in the contract, and in order that it may be so read, we quote sections 27 and 28 of the charter of he St. Louis Gaslight Company, which, as amended by section 10 of the act of February 11th, 1839, are as follows:

Section 27.   That if, after the expiration of twenty

years from and after the 1st day of January, 1840, the corporation of the city of St. Louis shall resolve to purchase the said gas-works from the St. Louis Gaslight Company, which they hereby shall have a right to do, the price shall be fixed by arbitrators, one or more to be chosen by the president and directors of the company, and an equal number by the board of aldermen of said city. Said arbitrators shall not be stockholders in said company nor members of said board of aldermen. They shall take into consideration the value of the gas-works and the lands, grounds, buildings, utensils, rights and interests and everything thereunto appertaining, and if they agree and so report in writing, their award shall be binding on the parties; but if they should not agree, then the said arbitrators shall elect some credable and disinterested person as umpire between them, whose decision and award in writing reported to the parties above shall be binding and conclusive, any law to the contrary notwithstanding. To the amount so agreed upon shall be added seven per centum advance on said valuation, which amount, with the seven per centum on the same, shall be paid by the corporation of the said city to the said company, in full consideration of their works, lands, grounds, buildings, interests, rights, utensils, &c., belonging to the said gas-works.

Section 28. That in the event the said city shall decline to purchase at the end of twenty years, as provided in the preceding section, then the company shall, in like manner, at the end of twenty-five years from and after the 1st day of January, 1840, and provided the board of aldermen then resolve to purchase the same, sell and convey to the city all their estate, interests and titles to the said gas-works in manner as is before provided in section 27; except that to the amount of valuation then so to be agreed upon, shall be added only five per centum advance, which amount, with the said five per cent. on the same, shall be paid by the city to the company in full of all consideration for the said gas-works and their appurtenances; provided,

however, that the corporation of the city of St. Louis shall notify the president and directors of the company of their intention to purchase at either of the times prescribed, at least six months previous to the expiration of the said terms of twenty years and twenty-five years respectively, and a failure to notify, as herein provided, shall be deemed a refusal on the part of the city to purchase the interest of the said company.

The right with which plaintiff and defendant were dealing in the 5th and 6th sections of the contract of 1846, was simply a privilege conferred upon the city by defendant's charter, of becoming the purchaser of the gas-works either on the 1st day of January, 1860, or the 1st day of January, 1865. The charter imposed no obligation on the city to purchase said works at either of those times, but the right conferred was to be exercised or not, entirely at the option of the city. This is clearly shown by the 31st section of the said charter, which provides that "should the said city not resolve to purchase at either of the times as provided herein, then this act shall be in full force for an additional term of twenty-five years from and after this last date mentioned." Now, according to the disposition made of this right by the contract of 1846, it is clear that the city could not exercise the charter privilege of becoming the purchaser of said gas-works on the 1st day of January, 1860, for the obvious reason that it explicitly and in terms relinquished the right to do so. It is also equally clear that the city, without any violation either of the letter or spirit of said contract, could have exercised the right of purchasing said works at the other time provided in the charter, viz: The 1st day of January, 1865. The said contract neither prohibited the city from purchasing on the 1st day of January, 1865, nor did it impose any obligation on the city not to purchase at that time. On the contrary, the contract expressly recognizes its right to purchase, the language of it being: "That in the event the party of the first part (the city) shall decline to purchase the gas-

works, property, &c., at the end of twenty-five years from the 1st day of January, 1840, * * it shall have the privilege of purchasing, as aforesaid, at the end of thirty years after the 1st day of January, 1840, and at every period of five years thereafter, in the manner provided in the 27th and 28th sections, and upon giving notice of intention to purchase as is provided in section 28 of said charter." This is equivalent to a declaration on the part of the St. Louis Gaslight Company to the city : We recognize your right, under our charter, to become the purchaser of our property either on the 1st day of January, 1860, or the 1st day of January, 1865. You have relinquished your right to purchase on the 1st day of January, 1860, and if you will not exercise your charter privilege of purchase on the 1st day of January, 1865, you shall have the right to purchase on the 1st day of January, 1870, or at any period of five years thereafter, under this contract, upon the same terms which would govern a purchase if made under the charter on the 1st day of January, 1865.

Having considered the nature of the right with which the parties were dealing in the contract of 1846, and the disposition made of it thereunder, it remains to apply as a test of its validity the principle heretofore announced, that corporations, whether public or private, must derive their right to contract from some power conferred by statute either in express terms or by necessary implication. We have been cited by plaintiff's counsel to section 13 of the act of February 11th, 1839, which, it is claimed, confers such power as was exercised by plaintiff and defendant in the contract of 1846. That portion of the section bearing on the question is as follows: " The corporation of the city of St. Louis and the board of directors of the St. Louis Gaslight Company may contract for and make regulations relating to the lighting of said city with gas, in such manner as may be agreed upon; and they may make generally such contracts in relation to the business

of the company as may be beneficial to them and the public."

This section is broad and comprehensive in its terms, and authorizes both plaintiff and defendant's board of directors to contract relative to the business of the company without limitation, they being left to determine the question as to whether any such contract would be beneficial to themselves and the public. But it is said that the contract of 1846 provides for the destruction of the business and selling out the entire property of the company and winding up its affairs, which, it is claimed, cannot be done without the assent of the stockholders.

The general doctrine that a board of directors of a corporation cannot sell out its business and property and defeat the object of its organization without the consent of the stockholders, may be conceded, but it has no application in a case where in the charter creating it, such power has been conferred on the directors. We think it clear that the General Assembly, regarding the erection of gas-works and supplying the city of St. Louis with gas as matters of public concern, did expressly provide that the board of directors not only could, but should sell out the business and property of the corporation either in 1860 or 1865 to the city of St. Louis, provided the requisite steps were taken by the city at either of the times to buy. This is provided for in the original charter of 1837; and in the amendment made to it by the act of 1839, the times at which said purchase might have been made under the act of 1839 were extended, and the power given to the city and the board of directors to make any contract relating to the business of the company which they might deem proper. The city, by its relinquishment of its right to purchase in 1860, absolutely continued the business of defendant, at the least till 1865, when, but for such relinquishment, it might have terminated its existence at that time. We think the language of section 13 of the amendment to the charter in the act of 1839 is broad

enough to embrace the power which was exercised in making the contract of 1846.

It is further objected that, as the circumstances and conditions of both corporations, which would exercise an influence and control the action of the board of aldermen in determining the question whether or not the city should purchase in 1860, did not exist in 1846, therefore, the board, in 1846, could make no contract surrendering such right of purchase which would be binding on the board that might be in existence in 1860. This argument addresses itself to the expediency or propriety of making such relinquishment, and not to the want of power to make it. We can perceive no reason why the city could not relinquish in 1846 the right to purchase in 1860, which it might or might not exercise at that time; and on this point we think the case of *Indianapolis v. Gaslight Co.*, decided at the June term, 1879, of the Supreme Court of Indiana, (Law Rep. 800,) is conclusive. The evidence shows that in 1846 the St. Louis Gaslight Company was in embarrassed circumstances, and it may have been manifest to the board of aldermen that the gas company would not prosecute any further the work of furnishing gas to the city, so long as it retained the right to terminate its existence in 1860; and that, without the relinquishment of such right the company would abandon its work, give up its franchise, and thus not only deprive the city of any option to purchase either in 1860 or 1865, but leave it to supply its streets with light by means of its own appliances.

But conceding, for the argument, that the contract of 1846 is invalid, we think that the defendant is estopped 2. CORPORATIONS: from setting it up in this suit. In the case of
contracts: estoppel. *Chouteau v. Goddin*, 39 Mo. 250, it was held " that where a party, by his acts or words, causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous condition, he will be concluded from averring anything to the contrary against the party so altering his

condition " So in case of *Pickard v. Sears*, 6 Ad. & E 474, Lord Denman lays it down as a clear rule of law " that when one, by his acts or words, willfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

Applying this principle to the facts in evidence, and a clear case of estoppel arises.   It appears from the evidence that in 1859 the plaintiff concluded to become the purchaser of the gas-works on the 1st day of January, 1860, and took the first preliminary step to accomplish that end by resolving that it would purchase the gas-works; that defendant, on being notified of this action, refused to appoint arbitrators, or to sell, on the ground that under the contract of 1846 the city had no right to buy.   This amounted, on the part of defendant, to an assertion of the validity of the contract of 1846, relying upon which the city took no further steps either in 1860 or 1865, but lost its right to purchase at both of said times, on the belief that under the contract, the validity of which defendant had thus asserted, it would have the privilege of purchasing according to its terms, on the 1st day of January, 1870, or at any period of five years thereafter.   These facts bring the case clearly within the operation of the rule above laid down, and it would be against every principle of justice and right to allow defendant, when it is sued in 1870 on said contract, to assert its invalidity, when by reason of the assertion of its validity in 1860 it caused plaintiff to forego the privilege of purchasing at that time, and secured to defendant the enjoyment of the profits of the gas-works, and the extension of its privileges at the least from 1860 to 1865.

It is, however, insisted that the contract of 1846, if valid, cannot be specifically enforced in a court of equity,

3. EQUITY WILL NOT COMPEL SPECIFIC PERFORMANCE OF OBLIGATION TO ARBITRATE, whether growing out of contract or statute: mandamus. and that the court erred in so decreeing. Before proceeding to a determination of this question, it is proper to observe that we regard this proceeding as an equitable one to enforce the specific performance of the contract of 1846; that the allegations contained in the bill in regard to the act of the General Assembly incorporating the St. Louis Gaslight Company, and acts amendatory thereof, are to be considered as mere inducements to the introduction of the contract of 1846, which is made in the bill the foundation on which the city predicates its right to sue. We can see no reason for alleging in the bill the clause in the 13th section of the act of February 11th, 1839, " That the city of St. Louis and the board of directors of defendant * * may make generally such contracts, in relation to the business of the company, as may be beneficial to them and the public," except to show an authority on the part of the city and defendant to make the contract of 1846, which is immediately after introduced in the bill. The only time alleged in the bill, when the city attempted to purchase, was on the 1st day of January, 1870, a time provided not in the charter but in the contract. There is no allegation of any resolution adopted by the board of aldermen in 1859 to purchase in 1860; but, on the contrary, an express averment that the city did forego the right to purchase both in 1860 and 1865, the only times provided for a purchase under the charter.

If the petition, in addition to the allegations it contains, had further alleged that the city resolved in 1859 to purchase on the 1st day of January, 1860, under the charter, giving timely notice thereof to defendant, and that defendant refused to appoint arbitrators or to sell, and asked relief on that ground, it would have been inconsistent with itself, and put the city before the court in the unenviable position of asking a recovery on its own breach of the very contract which in the same bill it was asking to have enforced. We may observe, in this connection,

that the evidence introduced on the trial, over defendant's objections, showing that the common council, on the 28th day of June, 1859, resolved that it was expedient for the city to buy the gas-works of defendant; that due notice thereof was given defendant; that thereafter, on the 24th day of July, 1860, an ordinance was approved providing for all things necessary to be done by the city to carry out the purchase, and appointing arbitrators on its behalf; that this action was communicated to defendant two days thereafter, which was replied to by the president of the gaslight company, inclosing a resolution adopted by the board of directors declining to sell the gas-works to the city; that it appeared from the twelfth annual report of the directors that the St. Louis Gaslight Company based its refusal to sell on the ground that the city, by the contract of January 9th, 1846, had relinquished its right to purchase on the 1st day of January, 1860—can only be considered, as we have, in a former part of this opinion, considered it, with a view of determining whether or not such action of defendant, in refusing to sell on the ground that under the contract of 1846 the city had no right to buy, shall be held to estop defendant from asserting in this suit the invalidity of said contract. While the evidence was admissible for that purpose, it was wholly inadmissible to establish a right of recovery by the city on account of anything then done, for the obvious reason that a plaintiff cannot allege in his petition one cause of action and be allowed to establish by the evidence another, and totally different and inconsistent one. This is every where recognized as an inflexible rule of law, a departure from which would lead to inextricable confusion in the administration of justice, hazard the rights of litigants and imperil the liberty of the citizens.

Holding then, as we do, that plaintiff's cause of action, as alleged in the bill, springs out of the contract of 1846, and reading it as if sections 27 and 28 of defendant's charter had been incorporated therein, the question arises; can such a contract be specifically enforced in a court of

equity?   It is insisted that it cannot be; First, Because it provides that the price to be paid shall be fixed by arbitrators to be chosen by the respective parties, and is, therefore, not enforceable till the price has been fixed in the mode agreed upon; Second, Because it is unilateral or one-sided, or lacking in mutuality of obligation.

We are of the opinion that the contract in question, referring, as it does, the matter of price to be paid to arbitrators, which by them is to be fixed, lacks an essential ingredient in a contract of sale, and until such price is fixed in the mode prescribed in the contract, it cannot be specifically enforced, and in this opinion we think we are sustained by an unbroken line of authorities, from some of which we cite. Mr. Fry, in his work on specific performance of contracts, lays down the following: Section 214. "In all cases of sale it is evident that price is an essential element of the contract, and that when this is neither ascertained nor ascertainable, the contract is void for incompleteness and incapable of enforcement." Section 216. "It is not, however, necessary that the contract should determine the price. In the first place it may appoint a way in which it may be determined, in which case the contract is perfected only when the price has been so determined. In case of default in this respect the contract remains imperfect and incapable of being enforced." Section 217. "The cases in which a mode is provided by the contract itself for the subsequent ascertainment of the price, fall under two classes. The first comprises those where the contract is to sell at a price to be fixed by arbitrators, this mode of ascertainment being an essential ingredient of the contract. The other embraces those cases where the contract is substantially for a sale at a fair price, the mode of ascertainment, though it may be indicated by the contract, being subsidiary and non-essential. In the former class of cases, if the mode of ascertainment fail, the contract remains incomplete, and consequently incapable of being enforced; in the latter when the mode of as-

certainment has failed, the court will have recourse to some other means of coming at the fair price, and of thus carrying out the contract in its essential parts."

In the case of *King v. Howard*, 27 Mo. 25, where the agreement of the parties was that the plaintiff's interest in certain real estate should be valued by appraisers, one to be selected by the plaintiff and one by defendant, who, in the event of disagreement, were to choose an umpire; the court held " that the agreement that each of the parties should select an appraiser to value the portion to be set off to plaintiff cannot be specifically enforced," and quotes approvingly from *Street v. Rigby*, 6 Ves. 815 : " that no instance is to be found of a decree for specific performance to name arbitrators," and also from 3 Story 800, where it was held that an " agreement to refer to arbitrators can neither be set up as a bar to a suit at law or in equity ; nor can it be enforced in a court of equity, when either party as plaintiff seeks it." " How could the court compel the parties to select appraisers ? And if even the parties selected them the court could not require the parties to choose a third person to act as umpire in the event of their disagreement; and if either party should refuse to name an arbitrator, the court has no authority to name or substitute any other person." So in the case of *Biddle v. Ramsey*, 52 Mo. 158, the doctrine of the above case was recognized to the fullest extent—Judge SHERWOOD, who delivered the opinion, observing : " The only question in this case necessary for solution is not, as has been with so much adroitness urged by respondent's counsel, whether an agreement to arbitrate can be the subject of a decree for specific performance, nor whether, as has been further, and with equal ingenuity urged, the court can substitute itself in place of the arbitrators, because the authorities, to the contrary, are unbroken in their uniformity on both these points."

The same principle is clearly stated in the case of *Hug v. Van Burkleo*, 58 Mo. 202, where it was held that " when parties to a lease by the terms of the contract agree that upon

the surrender of the lease-hold premises, the value of improvements made thereon shall be ascertained by three householders—the lessor and lessee each to select one, and those so selected to choose a third; in the event of a refusal of either to comply with such stipulation, it is out of the power of a court of equity, by the appointment of appraisers, or otherwise, to specifically enforce the contract thus made. A petition, however, which seeks to obtain equitable relief, on the above stated ground, will, although it asks for specific performance of such a contract, still state a cause of action, as equity would have jurisdiction in such case to have an account taken as to the value of improvements made.    *    *    The judgment of the court, because it attempts to specifically enforce the contract    *    *    between the lessor and lessee, must be reversed and cause remanded."

It is claimed by plaintiff's counsel that in the above case, as well as the case of *Biddle v. Ramsey*, the court, while denying specific performance of the contract, afforded relief, and they have cited it as authority to sustain the decree rendered in this case. There is no analogy between the grounds upon which the court proceeded in those cases and the one in hand. In the case last quoted from, it appears that the contract was fully executed so far as the lessee was concerned. He had gone into possession of the demised premises under the contract, and on the faith of a stipulation contained therein, that at the end of his term, upon surrender of the premises, the lessor would pay the value of the improvements, he had gone on and made improvements which attached to the freehold, and thereby became the property of the lessor. To have allowed the lessor thus to become the owner of the improvements, and to take advantage of his own wrong in refusing to name an appraiser and escape paying for them, would have been allowing him to practice a fraud on the lessee, and hence the court, on the ground of fraud, could have entertained jurisdiction, and given relief on the principle stated in

section 217, Fry on Specific Performance, *supra*, as governing courts of equity in affording relief or on the ground stated in the opinion of the court. No such equities appear in this case. So far as the evidence shows, there had been no expenditure of money by the city for improvement or otherwise, which defendant was seeking to appropriate to its own use without compensation.

The doctrine announced by this court in the cases cited is in accord with that of the highest courts both of England and our own country. In the leading case of *Milnes v. Gery*, 14 Ves. 400, where the agreement for sale provided that the valuation of the property sold should be fixed by two persons, one to be chosen by each party, and an umpire to be chosen by those two in case of disagreement, the bill for specific performance praying that the court appoint a person to make the valuation or otherwise ascertain it, was dismissed, the Master of the Rolls observing, " the only agreement into which the defendant entered was to purchase at a price to be ascertained in a specific mode. No price having ever been fixed in that mode, the parties have not agreed upon any price,    *    *    the price is of the essence of a contract of sale. In this instance the parties have agreed upon a particular mode of ascertaining the price. The agreement that the price shall be fixed in one specific manner, does not afford an inference that it is wholly indifferent in what manner the price is to be fixed. The court declaring that one shall take and the other shall give a price fixed in any other manner, does not execute any agreement of theirs, but makes an agreement for them upon a notion that it may be as advantageous as that which they made for themselves. How can a man be forced to transfer to a stranger that confidence which, upon a subject materially interesting to him, he has reposed in an individual of his own selection? No substantial difference arises from the circumstance. that, in this case, the decision may ultimately fall to an umpire not directly nominated by the parties, as, through the medium of the orig-

inal nominees, they had an influence in the choice. No one could be chosen without the concurrence of the persons in whose judgment they reciprocally confided.   *

*   Upon the principle that a fixed price was an essential ingredient in a contract of sale, the ancient Roman lawyers doubted whether an agreement that did not settle the price was at all binding. Justinian's Institutes and the Code state that doubt, and resolve it by declaring that such an agreement should be valid and complete when and if the party to whom it was referred should fix the price, otherwise it should be totally inoperative *quasi nullo pretio statuto*, and such is clearly the law of England. In this case the plaintiff seeks to compel the defendant to take his estate at such price as a master of this court shall find it to be worth. Admitting that defendant never made that agreement, and my opinion is that the agreement he has made is not substantially or in any fair sense the same with that, and it could only be by an arbitrary discretion that the court could substitute the one in the place of the other." We have quoted extensively from this opinion, because what is there said applies to the facts of the case before us.

So in the case of *Blundell v. Brettargh*, 17 Ves. 241, the Lord Chancellor observed that "there is no instance where the medium of arbitration or umpirage resorted to for settling the terms of a contract having failed, this court has assumed jurisdiction to determine that though there is no contract at law there is a contract in equity, and this court will specifically execute that contract to which the parties never assented." So in *Street v. Rigby*, 6 Ves. 817, the court held that "no instance is to be found of a decree for specific performance of an agreement to name arbitrators, or that any discussion has taken place in our experience for the last twenty-five years." In the case of *Agar v. Macklew*, 2 Sim. & Stu. 418, the Chancellor observed: "I consider it to be quite settled that this court will not entertain a bill for the specific performance of an agreement

to refer to arbitration, nor will it in such case subtitute the master for the arbitrators, which would be to bind the parties contrary to their agreement." So in the case of *Wilks v. Davis*, 3 Merivale 507, held that if one party agrees to sell and another to purchase at a price to be settled by arbitrators named by the parties, if no award has been made, the court cannot decree respecting it. The case of *Gourley v. The Duke of Somerset*, 19 Ves. 429, is to the same effect.

The principle thus firmly settled by these cases in England has been recognized by courts of the highest authority in the United States. In the case of *Toby v. County of Bristol*, 3 Story 800, the legislature of Massachusetts had passed an act authorizing the county commissioners to examine the claims of Toby against the county, and for which he had no legal or equitable remedy, and refer the same to the determination of arbitrators to be mutually selected by Toby and said commissioners, whose decision was to be final. Toby filed his bill setting up these facts, and the additional fact that the county commissioners would not appoint arbitrators, and praying for their appointment by the court. The relief was denied, Justice Story, who delivered the opinion, saying "that, supposing there was a real agreement, not conditional, but absolute, on the part of the commissioners, to refer the claims to arbitration. Can such an agreement be enforced specifically? No one can be bound, as I believe, and at all events no case has been cited by counsel or has fallen within the scope of my researches in which an agreement to refer to arbitration has ever been specifically enforced in equity." It may be observed that in the above case the authority of the county commissioners to refer to arbitration, and appoint arbitrators, was expressly conferred by statute, which makes it peculiarly applicable to the case before us, inasmuch as plaintiff's counsel insist that the duty of the gaslight company to appoint arbitrators to ascertain the value of its

property was imposed by express statute as well as by contract.

So in North Carolina in the case of *Norfleet v. Southall*, 3 Mur. 190, where the agreement was·that Norfleet was to pay Southall for a certain interest in a mill, the amount such interest cost Southall, which sum was to be ascertained by four persons by them named, the arbitrators met and were unable to agree on the sum so expended, and Southall rejected every proposition to refer the matter to an umpire or select any other set of arbitrators. Norfleet thereupon brought his bill for specific performance, which was denied, the court holding " that the parties have made an effort towards contracting, which has terminated in·an inchoate right, and if this court were to direct a reference to the master, or any other person, to ascertain the price and decree upon such a report, it would be making a contract for the parties and then enforcing it." So in Rhode Island in the case of the *City of Providence v. St. John's Lodge*, 2 R. I. 46, it is said : " It is undoubtedly true that a court of equity will not enforce a contract of sale when the price is to be fixed by arbitrators to be chosen by the parties, and for the plain reason that the contract sought to be enforced is incomplete in an essential particular, and the court have no power to substitute themselves or a master to fix the price in the place of the parties or the arbitrators to be chosen by the parties. This would not be to enforce an existing contract of the parties, but to make one for them." The same has been held in Wisconsin in the case of *Hopkins v. Gilman*, 22 Wis. 476, and in New York in case of *Greason v. Keteltas*, 17 N. Y. 491. No case has been cited by counsel where a contract for sale of property, in which it was agreed that the price to be paid should be fixed by arbitrators to be chosen by the contracting parties, has been specifically enforced.

We have been cited by plaintiff's counsel to a number of authorities where relief has been afforded in cases between lessor and lessee growing out of covenants for the

renewal of the lease at the end of the term. The most of them relate to cases where the lessee had gone into possession of the demised premises, and on the faith of the renewal covenants erected improvements. In such cases, where the lessor, after preventing renewal by refusing to appoint appraisers to ascertain the rental to be paid under a renewal, had sued at law to recover possession of the leased premises with the improvements put thereon, to prevent the perpetration of fraud, the courts, in some instances, have enjoined the proceeding at law, and in others have ascertained by its own methods the value of the improvements and the rental to be paid. The case of *Tscheider v. Biddle*, 4 Dill. 55, to which we have been cited by counsel for plaintiff, is illustrative of the character of cases in which courts of equity have given relief. In that case the lessor fraudulently, and to prevent renewal of the lease, appointed assessors with instructions not to agree with the assessors appointed by the lessee upon the value of the leased premises; and after thus preventing renewal, in a suit at law against the lessee for use and occupation, sought to appropriate to herself improvements put by the lessee on the leased premises, costing $113,000. Relying on the renewal covenant, the lessee filed a bill stating these facts, asking for specific performance and an order restraining the lessor from proceeding in the suit. Judge Dillon, after recognizing to the fullest extent, the doctrine that a court of equity will not enforce the specific performance of an agreement to refer to arbitration, made an order staying the prosecution of the law action for rent, observing that "such a rule or order does not contravene the principle contended for by defendant, that before there can be a decree for renewal, the rental must be fixed by arbitrators, and cannot be fixed by the court, since the object of the rule is to compel the defendant to himself appoint the assessor who is to represent him."

All the cases to which we have been cited by plaintiff's counsel either fall, first, into a class of cases like the above,

or, second, into that class where the contract provides that a fair rental value shall be paid without any mode being fixed by the parties for ascertaining it; or, third, into a class where the valuation is merely as to a subordinate part of a contract, the price being fixed in the contract as to the principal subject matter, or where the lessee had gone into possession under the lease. To the first class may be referred the following cases, cited by plaintiff's counsel, *Strohmaier v. Zeppenfeld*, 3 Mo. App. 429; *Biddle v. Ramsey*, 52 Mo. 153; *Hug v. Van Burkleo*, 58 Mo. 202; *Gregory v. Mighell*, 18 Ves. 328; *Gourlay v. Duke of Somerset*, 19 Ves. 429. The case of *Arnot v. Alexander*, 44 Mo. 27, to which we have been cited, may be referred to the second class of cases. The agreement in that was: " If this lease shall not be terminated, by forfeiture or any other cause, before the expiration of the five years, then said lessee, or his legal assigns, shall be entitled to a renewal of the same for five years longer, provided said parties can agree upon terms, or that said lessee is willing to give as much as any other responsible party will agree to give." These words were properly construed by the court to mean that the lease should be renewed at the rentable market value of the leased premises, and the contracting parties not having specified any mode for the ascertainment of such value, it was held that it was competent for the court to ascertain it. No question did or could arise on the facts of the case, as to the power of the court, when the amount of the rent for a renewal term is left to be determined by the valuation of third persons, to hear evidence and fix the amount of rent and decree specific performance; and hence the assertion made to the effect that in such cases the court had such power is mere *obiter*, and the only authority bearing at all upon that question, and cited in support of the dictum, *Hall v. Warren*, 9 Ves. Jr., 605, had in effect been overruled by the case of *Milnes v. Gery*, *supra*, and besides the dictum was in direct conflict with what had been held in the case of *King v.*

*Howard*, 27 Mo. 25, and what has since been held in the case
of *Biddle v. Ramsey*, 52 Mo. 158, and *Hug v. Van Burkleo*,
58 Mo. 202.   The cases of *Jackson v. Jackson*, 1 Small &
Gifford 184, and *Paris Chocolate Co. v. Crystal Palace Co.*,
3 Small & Gifford 124; *Kelso v. Kelly*, 1 Daly 419 ; *Johnson
v. Conger*, 14 Abbott 195, may be assigned to the third class.
None of these cases go to the extent contended for by the
plaintiff's counsel, nor do they in any wise overthrow the
principle governing courts of equity in denying specific
performance of a mere contract of sale, where the price to
be paid is to be fixed by arbitrators to be chosen by the
parties, and the price is not so fixed.   On the contrary we
find, upon examination of them, that most of them recog-
nize in emphatic language the correctness of the rule, and
in none of them is it disputed.

It is, however, earnestly argued that plaintiff's right
of action does not rest on contract, but upon defendant's
charter, and that it is by virtue of a legislative enactment that
it has the right to take the works and property of defend-
ant, and that, therefore, the rule does not apply.   Conced-
ing, for the argument, that plaintiff's right of action rests
on defendant's charter, and not on the contract of 1846, it
does not follow that the rule has no application.   On the
contrary, the reason upon which the rule is bottomed ap-
plies with much more force to such a case.   The reason
of the rule is that the chancellor, by substituting a master
in chancery, or by appointing commissioners to fix the
price of a thing sold, where the parties to the contract had
agreed that it should be fixed by arbitrators chosen by
themselves, would not be executing the contract of the
parties, but would be making a contract for them, and then
executing it.   If, therefore, the chancellor cannot substi-
tute his own will and make a contract for the parties to
which they never assented, neither can he substitute his
own will for that of the Legislature, and execute that to
which the Legislature never assented.   In the charter of
defendant the Legislature has undertaken to declare its

will as to how one corporation may purchase and become the owner of the property of another. As to how the St. Louis Gaslight Company may be divested of its property and the city of St. Louis invested with it, it has declared its will to be that, if, in either 1860 or 1865, the city of St. Louis resolved to purchase the gas-works, " the price shall be fixed by arbitrators, one or more to be chosen by the president and directors of the company, and an equal number by the board of aldermen of said city," who " shall take into consideration the value of the gas-works, lands, grounds, &c., of defendant, and if they agree, and report in writing, their award shall be binding on the parties, but if they should not agree, then the said arbitrators shall elect some creditable and disinterested person as umpire between them, whose decision and award in writing, reported to the parties above, shall be binding and conclusive, any law to the contrary notwithstanding," to which amount seven per cent., if the purchase was made in 1860, or five per cent. if made in 1865, was to be added; the amount thus ascertained, to be paid by the city, in full consideration of defendant's gas-works, property, rights and interests pertaining thereto.

Under the above expression of legislative will all that the city of St. Louis could be required to pay for the gas-works, in the event of a purchase, and all that the St. Louis Gaslight Company could demand would be the price fixed by arbitrators appointed by the city and defendant, and not the price fixed either by a master in chancery or commissioners appointed by the chancellor. The legislative will, that the price shall be fixed by arbitrators, to be chosen by plaintiff and defendant, would be as much defeated by the appointment of commissioners to fix the price of the gas-works, and compelling the city to pay and defendant to receive the price thus fixed, as would the contract of A and B, where A had agreed to purchase property of B at a price to be fixed by arbitrators, to be chosen by themselves, would be defeated by the appointment of com-

missioners to fix the price. In the latter case the chancellor would, by the substitution of a method for the ascertainment of the price not agreed upon by the parties, be exercising an arbitrary discretion in making a contract and then enforcing it; and in the former case by substituting a method for the ascertainment of a price not provided for in the law, would likewise exercise an arbitrary discretion in making the law and enforcing it. The Legislature declares in the charter to the city of St. Louis: If you purchase you shall pay the price fixed by arbitrators selected by the city and company; and declares to the gaslight company: You shall receive as compensation for your property the price thus fixed. If the prayer of plaintiff's petition is granted, as it is in the decree by the appointment of commissioners charged with the duty of ascertaining the value of the gas-works and fixing the price to be paid, and compelling the city to pay and the defendant to receive the price thus fixed, it would not be executing the will of the Legislature, but would be in contravention of it. In the decree the chancellor declares to the city: You shall pay, and to the St. Louis Gaslight Company: You shall receive, as full compensation for your property, the price fixed by commissioners appointed by the court; while on the other hand the Legislature, in the charter, declares to the city: If you purchase you shall pay; and to the company: You shall receive, as full consideration for the gas-works, &c., a price to be fixed by arbitrators, to be chosen by each of you respectively. Which is to prevail, the will of the Legislature or that of the chancellor?

But we are met with the argument that, under this view, the gaslight company could defeat the will of the Legislature by refusing to appoint arbitrators to meet with arbitrators appointed by plaintiff to fix the price. This by no means follows; on the contrary, in a proper case made in an appropriate proceeding, the defendant might have been compelled to appoint arbitrators. Had the city resolved to purchase at either of the times mentioned in

the charter, given notice of its resolve to defendant and appointed arbitrators, on defendant's refusal to appoint it might have been compelled to do so by mandamus, so that the price could be fixed as by law was prescribed; or the State could have proceeded by *quo warranto*, and forfeited its charter by reason of its willful refusal to comply with one of the conditions on which it accepted it, and thus taken back to itself the franchise and conferred it upon the city. *Union Pacific R. R. Co. v. Hall*, 1 Otto 343; *The People ex rel. v. Manhattan Gas-works*, 45 N. Y. 136; *United States v. Union Pacific R. R. Co.*, 3 Dill. 524. We are, therefore, of the opinion that it matters not whether the present proceeding is to be regarded as founded either solely on the contract of 1846, or partly on the said contract and charter of the St. Louis Gaslight Company, or solely on the charter of said company, since, in either case, specific performance could not be decreed.

It is also insisted by defendant, that the trial court erred in holding that the tripartite contract of February 28th, 4. CORPORATIONS: 1873, to be invalid. The provisions of said contracts: consideration: ultra vires. contract are fully set out in our statement of the case, and in substance provide that the St. Louis Gaslight Company relinquishes to the city its exclusive right to manufacture and vend gas north of the south line of Washington avenue; that all suits pending between the city and defendant shall be dismissed, and all causes of action between them considered as settled; that the city is to have two years' time in which to pay what it owed defendant; that the agreement was to be a substitute for the contract of 1846, which was to be canceled; that the defendant would lay, at least, two and one-half miles of mains in each year, as the city might direct, without charge to the city, anything in the charter to the contrary notwithstanding. On the part of the plaintiff it is claimed that said contract is void; first, because it is without consideration; second, because it is *ultra vires* the city; and third, because it is *ultra vires* the defendant.

As to the first objection, the question is not as to the adequacy of the consideration, but whether there is any consideration at all. It will be perceived that in the 26th section of defendant's original charter it had the right to charge the city eight per cent. on the cost of pipe and laying the same, and that the gaslight company was not bound to lay any pipe, when the proceeds arising from the sale of gas would not be sufficient to defray the expenses of furnishing the same. The right to make this charge against the city for laying the pipes is expressly yielded to the city in the fourth clause of the 1st section of the contract of 1873. The surrender of this right, the stipulation on the part of the gaslight company to dismiss all suits pending against the city and the actual dismissal of them, as the evidence shows, the extension of time for two years for the payment of what the city owed defendant; the surrender of its exclusive right to manufacture and vend gas in a large part of the city are, we think, sufficient considerations to support the contract of 1873. It is not necessary that a consideration should be adequate in point of value to make it sufficient. If benefit or advantage be received by the promisor from the promisee, or if detriment or injury be sustained by the promisee, it will constitute a sufficient consideration. *Marks v. Bank of Missouri,* 8 Mo. 316.

It is argued by counsel for plaintiff that the city, when it resolved to purchase the gas-works, gave notice of its intention to purchase and appointed arbitrators, became the owner thereof, and that the property thus acquired being for a public or governmental purpose, it was beyond the power of the city to agree to dismiss this suit in which such right was asserted, and cancel the contract of 1846, under which it claimed the right to purchase. We think the argument unsound. We recognize the principle, for the establishment of which counsel have cited numerous authorities, that in a completed contract of sale the vendee is treated in equity as the owner of the property sold,

and the vendor as the owner of the purchase price. §§ 790, 1212, Story Eq. This rule is usually, if not universally, applied by a court of equity when dealing with a contract of sale so far completed that it can decree a specific performance respecting it. We have announced as our conclusion, after an investigation of the authorities bearing on the question, that the contract on which plaintiff's right of action is based is not of that character, and this view of the subject disposes of the objection and argument made to sustain it, that the city went beyond its powers when it agreed in the tripartite contract of 1873 to dismiss a suit, which, under our ruling, ought to have been dismissed without regard to the contract of 1873.

Besides this, the following clause from defendant's charter "that the corporation of the city of St. Louis and the board of directors of the St. Louis Gaslight Company * * may make generally such contracts in relation to the business of the company as may be beneficial to them and the public," which has been cited by plaintiff's counsel in support of the power of the city to make the contract of 1846, in like manner supports the power of the city to cancel it.

It is also insisted by plaintiff's counsel that the St. Louis Gaslight Company, in the contract of 1873, transferred chartered rights, surrendered and abandoned a duty it owed to the public to furnish gas in that portion of the city north of Washington avenue, and that, therefore, the contract is void. We agree to the correctness of the principle contended for, that one corporation by transfer or sale to another cannot absolve itself from the performance of a duty it owes to the public. It is claimed that this surrender and abandonment of a public duty and transfer of rights appear in the following provision of the contract: "That the St. Louis Gaslight Company waives, abandons and surrenders, forever, to the city of St. Louis, irrevocably, any and all claims and pretense of claim of exclusive right to have gas-works, lay or have pipes or other appli-

ances, vend or furnish gas, or do business as a gas company in the following district or portion of said city, to-wit: All of the portion or district of said city, as it now or hereafter may be, lying or being north of a line as follows: Commencing at a point in the eastern boundary line of said city where the southern line of Washington avenue extended eastwardly would cross the same; thence along the southern boundary line of Washington avenue westward, and continuing on the same line, extended to the western boundary line of said city, as such boundary line now is, or may hereafter be by extension of the limits and boundaries of the city; said district so surrendered to include also all buildings and erections now existing, or hereafter to be built or erected on the south side of said avenue or line, and fronting or to front thereon; and the St. Louis Gaslight Company covenants and agrees with the said city and the Laclede Gaslight Company, that it will not, within said district or portion of the city, at any time, assert any claim or right to hinder or prevent the erection or completion of any gas-works, or any laying down of main pipes or other things, or furnishing or supplying gas to the city and its inhabitants by any gas company or private individual; and that no suit shall ever be commenced, nor any act or thing be done by the St. Louis Gaslight Company to hinder or molest the Laclede Gaslight Company, or any other gas company or private individual, in erecting, having or using the works, pipes and appliances for carrying on the business of a gaslight company and furnishing gaslight to the aforesaid portion or district of said city, so that both of said gas companies, and any other gas company or private individual, shall be permitted to exist and do business in the aforesaid district or portion of said city without hindrance."

By defendant's charter it had "the exclusive right" to manufacture and sell gas in the city of St. Louis. What do the terms "exclusive right" import? They simply mean that the defendant had the right to exclude any

other person or corporation from pursuing the same business, or, in other words, the right to exclude competition. This right to exclude competition was not a right vested in the company for the benefit of the public, because in its very nature it was injurious to the public; but it was a right vested in the company for its own benefit, which it might, therefore, surrender with the consent of its stockholders. The right to make and vend gas to the city and its inhabitants was a right conferred upon the company for the benefit both of the company and the public, and not for the sole benefit of others; but the right to exclude competition was solely for the benefit of the company. If, in the provision of the contract above quoted, the company surrendered and abandoned a right to make and vend gas in that portion of the city described therein, then the position taken by counsel that it abandoned a public duty is maintainable. We do not think that said provision is susceptible of that construction, but, on the contrary, it is expressly declared "that both of said companies or any other company or individual shall be permitted to exist and do business in the aforesaid district or portion of said city without hindrance." We think it clear that the St. Louis Gaslight Company did nothing more than surrender its right to exclude all competition in that part of the city lying north of Washington avenue, reserving to itself the right to meet any demand which might lawfully be made upon it by the public. There is no abandonment or surrender on the part of the St. Louis Gaslight Company of its right, or surrender or abandonment of its duty to make and vend gas north of the south line of Washington avenue.

Nor does the contract transfer to the Laclede Gaslight Company the right to make and vend gas in that district. The Laclede Gaslight Company obtained its right to make and vend gas, not from the St. Louis Gaslight Company, but from the act of the General Assembly incorporating it, subject, of course, to the vested rights of the St. Louis

Gaslight Company. When the act of 1857, incorporating the Laclede Gaslight Company, was passed, whereby it was authorized to make and vend gas only in a certain part of the city, and when the amendatory act of 1868 was passed, whereby it was authorized to make and vend gas through-out the entire limits of the city, the St. Louis Gaslight Company, by virtue of its charter, passed in 1837, had the right to exclude the Laclede Gaslight Company, as well as all other persons, from making and selling gas in the city. This was evidently in the mind of the Legislature when the act of 1868, amending the charter of the Laclede company, extending its right to sell gas throughout the entire limits of the city, was enacted; and hence it was expressly provided therein that the right thus conferred could only be exercised in subordination to the vested rights of the St. Louis Gaslight Company to exclude all competition. It may, therefore, we think, be clearly implied that it was the purpose of the Legislature that the Laclede Gaslight Company might obtain, if it could, from the St. Louis Gas-light Company, a waiver or abandonment of its right to exclude competition. If this was not the design of the Legislature, the act authorizing the Laclede to make and vend gas, confers nothing and means nothing.

Besides this, it has been insisted by counsel, and we have so held, that the power conferred in section 13 of the act of February 11th, 1839, was comprehensive enough to uphold the directors of the St. Louis Gaslight Company in making the contract of 1846, whereby if a purchase had been perfected under it all the rights and property of defendant would have been transferred to plaintiff, and the St. Louis Gaslight Company obliterated; and, if comprehensive enough to authorize the directors to make a contract of that kind, it logically follows that said section is comprehensive enough to authorize the directors in the contract of 1873 to stipulate for the surrendering, not of its right to make and vend gas in any part of the city, but

simply for the surrender of its right to exclude competition from a part of the city.

These conclusions necessarily lead to a reversal of the judgment. We, therefore, reverse the judgment and remand the cause, with directions to the circuit court to make a rule or order directing and requiring the receiver, appointed by the decree, to restore to the possession of defendant the gas-works and all property, real and personal by him received in virtue of said decree, together with the profits derived therefrom; that he report his action to said court, upon approval of which the bill shall be dismissed.

Judges NAPTON, HOUGH and HENRY concur. SHERWOOD, C. J., not sitting.

HOUGH, J—I fully concur in all the views expressed in the foregoing opinion.

NAPTON, J.—As all the judges are agreed that the tripartite contract of 1873 is valid, and this conclusion virtually settles the case, I will only venture to add a few words explanatory of my individual views in regard to some of the subordinate points discussed.

It is of no importance, in my opinion, so far as results are concerned, whether the contract of 1846 be held valid or otherwise; if invalid, this suit, which is to enforce an obligation created by it, must of course. fail, and if valid, the discharge of that obligation, assumed in 1846, by the contract of 1873, is equally fatal to the maintenance of the action. Assuming the contract of 1846 to have been invalid, which I think it was, so far as it attempted to bar the city from purchasing under the provision of the charter in 1860, the resolution of the city in 1860, preceded by the notice in 1859, undoubtedly imposed a duty on the gas company which could not be evaded or annulled by any obstinacy on the part of the company. The plain intent of the charter was to effect a transfer of the property, and not a compensation in damages for a failure to

transfer. It was certainly a one-sided obligation, made so by the charter, the city not being compelled to buy at any time, and the company being compelled to sell only at certain specified periods.

The Legislature had it in their power to dispense with any equity rules in regard to the specific performance of contracts, and would be so undersood to have done, unless an equally efficient mode of producing the result rendered such dispensation unnecessary. But the latter question is, in my opinion, unimportant, since the proceeding begun in 1859 was abandoned by the city, as it had the right and power to do—for there was no obligation ever imposed on the city to buy the works at any time. Nothing was done by the city for ten years, until in 1870 this suit was instituted under the contract of 1846.

Admitting that this contract of 1846 was valid, so far as to allow the city to purchase in 1870, it would seem that the parties to it would have equal power to abandon it. A transfer of the property of the gas company to the city could not be effected by a mere resolution to buy and, therefore, the contract of 1873 was no sale of property already belonging to the city. Whether such property, after being conveyed to the city, would be any longer within the power of the city to sell, is outside of the present case. Aside from all questions as to specific execution of contracts, or as to the condition of the property, had the agreement been specifically executed, the tripartite contract 1873 was a settlement, upon adequate consideration, of all antecedent disputes, and put an end to all claims arising under the contract 1846. As to the relation of the two companies, the Laclede and the St. Louis, towards each other, and towards the city, the subject is fully considered in the opinion of the court, in which I concur.

HENRY, J.—The interest which this case has excited, the zeal and ability which counsel for the respective parties have exhibited in the argument, together with the fact

that I do not entirely agree with either of my associates, demand that I should state briefly the views I entertain on the points involved in the controversy.

I hold that the contract of 1846 was invalid, whether the charter of the city or that of the gas company gave the city a general power to purchase or not. The charter of the gas company, by express provision, gave the city the right to purchase in 1860 or 1865, whether the gas company should desire to sell or not. The city had the option to purchase at either of those periods, while the company had no option in the matter, but by the terms of its charter was compelled to sell if the city, in the manner indicated by the charter, expressed a desire to purchase; and, conceding that the city, under some general power in its charter or the charter of the company, might either before or after those periods have purchased its gas-works and property of the company, the latter agreeing to sell, yet no board of aldermen, prior to the time at which initial steps toward the purchase could have been taken under the charter, could nullify the provisions of the charter authorizing a purchase by the city in 1860 or 1865. This view the city held and acted upon in 1859, when it duly notified the company of its purpose to buy. The Legislature declared that in 1860 or 1865, the city should have the right to buy, and that at either of those periods if the city properly declared its purpose to purchase, the gas company should sell. Admitting that at any time, *with the consent of the company*, the city had the right to purchase, yet by no contract, except one of purchase of the company's property prior to 1860, could a board of aldermen waive the right and prevent its exercise by the city at the designated period. The aldermen in 1860 might have declined to make the purchase, but could not bind the aldermen of 1865 not to purchase at that period.

But, conceding the validity of the contract of 1846, there can be no specific performance of the contract enforced, as I think is conclusively shown in the opinion of

Judge NORTON. And even if it were such a contract as could be specifically enforced in equity, it was rescinded by that of 1873—as to the validity of which I agree with my associates. The city was not obliged, by any provision of her charter or that of the gas company, to buy the works and property of the latter at any time. It was always optional with the city, and until the purchase was made the option continued. The power to make an executory contract implies the power to rescind it, when, in the first place, it was optional with the party desiring to rescind to make the original or not. If the city had once acquired the property, the question of her power to dispose of it, so ably discussed by counsel, would be pertinent, but she never made the acquisition, and whether the property is of a character which the city might have sold, if she had ever owned it, it is not necessary to determine. The contract of 1873 was in no sense a sale of the gas-works by the city, but the relinquishment of a right to acquire them under the contract of 1846.

The resolution of the board of aldermen in 1859 declaring, in conformity with the charter, the purpose of the city to buy the gas-works, was a nullity, if the contract of 1846 was valid and binding on the city, and on the proposition that it was valid the plaintiff must, in this case, stand or fall. That resolution was in direct violation of the contract of 1846, by which the city relinquished the right to purchase in 1860. And how the city, suing upon that contract, can derive any benefit from an act in flagrant violation of that contract, I cannot conceive. But the purpose expressed in that resolution was abandoned by the city. The company refused to sell, whether rightfully or wrongfully we need not stop to inquire, and the city ever since has acquiesced; for this suit is not to enforce the charter right of the city to purchase, but the right acquired by the contract of 1846. There is nothing in the provision of the charter to countenance the idea that the board of aldermen which passed the resolution to purchase, could

not rescind it, or that when passed the city was bound to proceed with the purchase. The evident meaning and intent of the statute is, that the city should have the option to purchase at the designated periods, and that this option should continue until a consummation of the purchase. If, in 1860, the city had followed her resolution with proper steps, she could have compelled the transfer of the property by the company by a proceeding in mandamus. The duty imposed upon the company to sell and convey in 1860 or 1865, if the city then determined to buy, in the manner provided by the charter, was a corporate duty which it would have been compelled to perform by mandamus. As not otherwise herein indicated, I fully concur in the opinion of the court.

## On Motion for Rehearing.

Hough, J.—At the argument of this cause three leading propositions were affirmed on behalf of the city: first, the validity of the contract of 1846; second, the power of a court of equity to specifically enforce that contract; third, the invalidity of the tripartite agreement of 1873.

Two of the members of this court present at the hearing inclined to the opinion that the contract of 1846 was originally invalid; two were of opinion that it was originally valid; all were of opinion that if valid, it was not susceptible of specific enforcement; and all were of opinion that the tripartite agreement of 1873 was a valid and binding agreement. A motion for rehearing has been filed, in which we are asked to review our judgment upon the last two points.

The rule of this court in relation to motions for rehearing requires that such motion shall "be founded on papers showing clearly that some question decisive of the case, and duly submitted by counsel, has been overlooked by the court, or that the decision is in conflict with an express statute, or with a controlling decision to which the

attention of the court was not called through the neglect or inadvertence of counsel." Neither in the motion for a rehearing, nor in the brief filed in support of it, has this been done, nor do we think it could have been done. The case was thoroughly argued by counsel and was carefully considered by the court. No question decisive of the case and duly submitted by counsel, was overlooked by the court. It is not pretended that our decision is in conflict with any statute, nor is there any controlling decision now cited, to which our attention was not called at the argument through the inadvertence of counsel or otherwise. We might, therefore, with perfect propriety, decline further to consider the motion. But, in consideration of the magnitude of the interests involved, the extraordinary zeal of counsel and the labor expended by them upon the brief which has been filed, we will, without intending that our action in this regard shall be drawn into a precedent, briefly review several of the cases which are cited as being at variance with the opinion of this court.

The first case to be noticed is that of *Wilks v. Davis*, 3 Mer. 509, decided in 1817. It is unneccessary to state the facts. *Cooth v. Jackson*, 6 Ves. 34; *Milnes v. Gery*, 14 Ves. 400, and *Blundell v. Brettargh*, 17 Ves. 232 were cited in argument. The Lord Chancellor said: "It has been determined in the cases referred to, that if one party agrees to sell and another to purchase at a price to be ascertained by arbitrators named by the parties, if no award has been made, the court cannot decree respecting it; on the other hand, there are cases which determine that if the parties are agreed as to the valuation, but have not appointed any person to make the valuation, the court will itself interfere so as to ascertain the value in order to direct the specific performance; but the case now before the court is different from either, the court being here called upon, not to ascertain the value but decree specific performance by the defendant conveying at such price as certain arbitrators named shall hereafter fix. No arbitration bond having

been executed, and it not being known that any award will ever be made, the strong inclination of my opinion is, that such bill cannot be maintained, although no direct authority has been produced, either in favor of it or on the other side." The decision in this case is invoked by the counsel for the city in the following language:

"In the case at bar on the theory that the 27th and 28th sections of the charter of the gas company are part of the contract of 1846, and that they have no other force than that which was derived from being in that contract, it will be seen that the parties agree to the valuation of certain specifically named property, but do not appoint the persons to make the valuation. Lord Chancellor Eldon says, in this case of *Wilks v. Davis*, that under such circumstances *the court will itself ascertain the value and decree specific performance.* No better authority is needed to sustain our bill than this case of *Wilks v. Davis*." Counsel manifestly misconceive the meaning of the chancellor. The chancellor did not mean that when the parties had agreed upon a valuation, and had stipulated in their contract that arbitrators should be chosen by them respectively to make such valuation, and the parties failed to select arbitrators according to their agreement, the court would itself interfere in order to ascertain the value. *No such case is to be found in the books.* Besides, such a construction would be in direct conflict with the principle announced in *Milnes v. Gery*, approvingly referred to by the chancellor in the first paragraph of his opinion, wherein it was expressly decided that when in the sale of property, a valuation is agreed upon and a specified mode of making such valuation is likewise agreed upon, and that mode fails, there is no agreement between the parties which can be carried into execution. What the chancellor evidently meant was, that where it was agreed that property should be taken at a valuation, and no appraisers were named in the contract, and none were directed by the contract to be named by the parties or to be otherwise appointed to fix

such valuation, the court could fix it.. In such case as the parties have agreed that the property is to be taken at a valuation, and as they have not designated any persons to fix the value, the agreement is nothing more than an agreement to sell at a fair valuation. Sir William Grant in *Milnes v. Gery*, after speaking of agreements to sell at a price to be fixed by arbitrators, said: " The case of an agreement to sell at a fair valuation is essentially different. In that case *no particular means of ascertaining the value are pointed out;* there is nothing, therefore, precluding the court from adopting any means adapted to that purpose."

In the case of *Agar v. Macklew*, 2 Sim. & Stu. 418, decided eight years after *Wilks v. Davis,* the contract provided that the plaintiff should, within a time named, be at liberty to purchase certain property *at a price to be fixed by two persons, indifferently to be chosen as appraisers,* one by each party, and in the event of their disagreement, they were to select an umpire. The plaintiff, as in the case at bar, selected an appraiser and requested the defendant to select one, which he refused to do. The plaintiff filed a bill for specific performance, and the defendant put in a general demurrer for want of equity. The case of *Wilks v. Davis* was cited in argument, and the paragraph of that opinion now relied upon by counsel, was brought to the attention of the court; but the court held that it was powerless to grant the plaintiff any relief, saying: "I consider it to be quite settled that this court will not entertain a bill for the specific performance of an agreement to refer to arbitration, nor will, in such case, substitute the master for the arbitrators, which would be to bind the parties contrary to their agreement. The demurrer must be allowed." In further confirmation of the correctness of this view, it will not be inapt to quote the language of Lord Chancellor Cranworth, in the case of *Morgan v. Millman*, 13 Eng. L. & Eq. 34, and 3 DeG., M. & G. 24, decided by the lords justices of appeal in 1853. He said: *"All the authorities* (the case of *Milnes v. Gery*, 14 Ves. 400; *Blundell v. Bret-*

*targh,* 17 Ves. 232, and *Gourlay v. Duke of Somerset,* 1 Ves. & B. 68), enunciate the proposition in the strongest language, that when the parties have stipulated that the price shall be ascertained by arbitration—in *Blundell v. Brettargh,* it was by particular arbitrators; in *Milnes v. Gery, it was not by a particular arbitrator, but by arbitration generally*—if the arbitration does not proceed and the price be so ascertained according to the mode in which the parties have stipulated, *this court has no right to make a different contract than the parties had entered into, and ascertain the price for them in some different mode.*"

The next case cited, the opinion in which seem to be both misunderstood and misapplied, is that of *Morse v. Merest,* 6 Maddock's Rep. 25. In that case three referees were named in the agreement of sale, who were to make a valuation on or before a certain day. The defendant prevented the valuation by the day named, by refusing to permit the referees to go upon the land. The court held that he could not take advantage of a delay which he had himself improperly occasioned, and then said, "that a man who agreed to sell at a price to be named by A, B and C *could not be compelled by a court of equity to sell at any other price;* but it appearing that the defendant refused to permit the referees to come upon the land, the court had jurisdiction *to remove that impediment,* and would decree that the defendant should permit the valuation to be made according to the contract, *and if it were so made then a supplemental bill must be filed for a specific performance upon the terms of their valuation.*" This case, it will be seen, is in perfect harmony with the opinion of this court.

The last case we will notice is *Dinham v. Bradford,* 5 Chancery Appeal Cases 519, on the reasoning of which counsel for the city declare themselves perfectly willing to rest their case. In that case Bradford, who was a manufacturer of washing-machines and the owner of several patents relating to such machines, admitted Dinham into partnership with him for three years. The whole plant

and property of the partnership, including patents and everything else valued at $6,000, was contributed by Bradford, and Dinham contributed $1,000 in money. Bradford was to receive two-thirds of the profits and Dinham one-third. It was provided in the articles of co-partnership that *at the expiration of the partnership* the value of the share of Dinham of and in the property and effects of the partnership should be ascertained by two indifferent persons chosen by the parties, and Bradford should become the purchaser at such valuation. At the termination of the partnership disputes arose as to Bradford's share in the capital, and Dinham filed a bill for the settlement of the co-partnership affairs, praying that an account be taken, a receiver appointed, and that the assets of the business be sold. The court held that it was the clear and manifest object of the agreement that the property was not to be broken up or sold, but the value of the share of Dinham was to be ascertained; that the whole scope and purport of the agreement was that the partnership was to go on for a certain definite time, and at the end of that time Bradford was to pay Dinham his share. The Lord Chancellor said : " *This case is not like that of the sale of an estate, the price of which is to be settled by arbitration*, but is a case in which the whole scope and object of the deed would be entirely frustrated if the court were to apply the well-known doctrine to the present state of circumstances. In cases of specific performance the matter is very plain and simple. One person agrees to sell his estate in a given way and no rights are changed by the circumstance of that method of selling the estate having failed. The estate remains where it was, and the money where it was. But here is a man who has had the whole benefit of the partnership in respect of which this agreement was made, and now he refuses to have the rest of the agreement performed on account of the difficulty which has arisen. It is much more like the case of an estate sold and the timber on a part to be taken at a valuation, the adjusting of matters of that sort form-

ing part of the arrangement, *but being by no means the sub-stance of the agreement*; and in such cases the court has found no difficulty. If the valuation cannot be made *modo et forma*, the court will substitute itself for the arbitrators. *It is not the very essence and substance of the contract, so that no contract can be made out except through the medium of the arbitrators.* Here the property has been had and enjoyed, and the only question now is, what is right and proper to be done with regard to settling the price."·

In this case it will be perceived the partnership was at an end, the accounts were to be settled, the joint property was on hand and had to be disposed of in some way, either by a sale thereof, which, as the Lord Chancellor said would have been contrary to the whole spirit and object of the agreement, and might have deprived Bradford of his pat-ents and the power to continue his business; or by ascer-taining the value of Dinham's share therein and charging the amount thereof against Bradford. In such cases it is plain the valuation provided for is not the very essence and sub-stance of the contract, so that no contract can be made out except through the medium of the arbitrators. The es-sence and substance of the contract between the parties was not the acquisition by Bradford of Dinham's interest in the property of the partnership, *for at the time the con-tract was entered into Bra'lford already owned the property, and Dinham had no interest in it.* The essence of the con-tract was that these parties should do a manufacturing business, as co-partners, for the period of three years, and share the profits in certain proportions; and this part of the contract was fully performed. In order to prevent the sale of the plant and patents and other property of the firm for the purpose of settling the affairs of the partnership at its termination, it was provided that Bradford should take Dinham's interest at a valuation; and this being a mere incident to the main contract, which had been fully performed, the chancellor held it must be carried into effect, and if the valuation could not be made *modo et forma*,

still. it must be made, and the court would make it rather than permit Bradford's entire interest in the property of the firm to be also sold contrary to the spirit of the agreement.

The glaring dissimilarity between that case and the case at bar would seem to render all comment unnecessary. The city never transferred the gas-works to the defendant and permitted it to enjoy the profits thereof on condition that it was after a time to have them back again at a valuation.    The city never owned the gas-works.    It was not even *required* to purchase them.    It had no *right* to them in 1860, as is assumed by counsel.    The city had the mere privilege of acquiring a right in a certain specific mode— nothing more—and this privilege it voluntarily surrendered for the privilege contained in the contract of 1846.

It is not every contract for the sale of property which can be specifically enforced.    Suppose two citizens of St. Louis should, by written contract, agree that within a given time, or on a day named, one should have the right to purchase from the other a valuable estate at such price as they should on said day mutually agree the same was worth. Such an agreement would manifestly seem to contemplate that the property should be fairly valued.    But suppose that on the day named, the parties should meet together, and could not or would not agree, would any one pretend that in such a case the owner could be compelled to sell his estate for such an amount as some other person should determine was a fair price?    Would not a decree of court which should, under such circumstances, compel the owner to sell against his will and against his agreement, for a price to be fixed by a master in chancery, deserve to be characterized as an arbitrary and illegal interference with the rights of private property?    Now there is in reality no difference between the case put and one in which the parties stipulate that they will not personally meet to negotiate about the price, but that each will send an agent or representative or arbitrator to act for him.    Unless these arbi-

trators meet and agree, or failing to agree, call in an umpire, where one is provided for, it is manifest that there is no completed contract of sale; and no court has or should have the power to complete the contract of sale for the parties and then enforce it. This is, in brief, the common sense of all the decisions on the subject. The fault, if any, lies in the agreement of the parties, and not with the law. We are speaking, of course, of contracts of sale by arbitration, *simpliciter*, such as the case at bar, and not of cases where new rights and controlling equities have arisen out of the transfer or delivery, by the vendor, of the subject matter of the contract into the possession of the purchaser, before the price was ascertained, nor where the valuation provided for is subsidiary and incidental, and not an essential portion of the contract; such cases stand upon an entirely different footing

As to the second point. It is now contended that the contract of 1873 is invalid, because the city had no power to surrender the right to purchase conferred by the contract of 1846. The suit of the city is founded upon that contract of 1846. The city asserts the validity of that contract. It asserts, therefore, that it had the power to surrender the privilege conferred upon it by law, of becoming the purchaser in a specified mode, of the property of the defendant in 1860, for this was yielded by the contract of 1846. Of course it had equal power to relinquish the privilege of purchasing in 1865. Now it seems to us too plain for argument that if the city could relinquish a privilege conferred upon it by law, it could relinquish a similar privilege conferred upon it by its own contract; that it relinquished the privilege of purchasing under the contract of 1846 is, therefore, no objection to the validity of the contract of 1873.

As to the agreement between the St. Louis company and the Laclede gas company of February 14th, 1873, forbidding mutual encroachments upon designated territory therein allotted to each, and now urged upon our attention,

it is only necessary to say that it was made before the execution of the tripartite contract, which was entered into February 28th, 1873; that it constitutes no part of that contract, and was not before us for adjudication in this suit. We, therefore, make no ruling in regard to it. Besides it is expressly provided in the tripartite agreement that both of said companies, and any other gas company or private individual, shall be permitted to exist and do business in that portion of the city lying north of Washington avenue. The motion for rehearing will be overruled. Judges NAPTON, HENRY and NORTOR concur. Judge SHERWOOD not sitting.

NAPTON, J.—My views on his case have already been stated. The case was fully argued at the bar orally and in thirteen printed briefs, and was held under advisement by the court for a month. The motion for a rehearing pointed out no omission or misunderstanding of facts in the opinion of the court. I, therefore, voted against granting a rehearing or allowing further time for re-argument of the points decided, and take this occasion to enter my protest against rehearing and redeciding cases under such circumstances.