## THE ANGELICA JACKET COMPANY, Respondent, v. ANGELICA, Appellant.

**St. Louis Court of Appeals, December 11, 1906.**

1. **CONTRACTS: Public Policy: Restraint of Trade.** The old doctrine that agreements in restraint of trade were void without exception has been greatly modified by modern adjudications; so that the courts will now enforce covenants which impose restriction on the right to trade, not only when the restraint is special, but when it is general throughout the entire State or country, provided the agreement is founded upon a sufficient consideration and is not unreasonable in view of the nature and extent of the business of the covenantee.

2. ————: ————: ————: **Injunction.** Where a party who had established a profitable business, sold for a valuable consideration the good will and the right to the use of her name, and agreed for a certain period not to "engage in the same character of business" within a certain territory, the contract was valid, and its violation was properly restrained by injunction.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*T. J. Rowe* and *Henry Rowe* for appellant.

*Stern & Haberman* for respondent.

The contract in this case is a lawful one and its covenants enforceable. Mallinckrodt v. Nemnich, 63 Mo. App. 9; Presbury v. Fisher, 18 Mo. 51; Peltz v. Eichel, 62 Mo. 173; Enameling Co. v. Haberman, 120 Fed. 415; Match Co. v. Roeber, 106 N. Y. 473; 2 Parsons on Contracts, p. 748; Rousillon v. Rousillon, 14 L. R. Ch. Div. 351; Horner v. Graves, 7 Bing. 735; Whittaker v. Howe, 3 Beav. 383; Oregon v. Windsor, 20 Wall. 64; Leslie v. Lorillard, 110 N. Y. 519; Presbury v. Fisher, 18 Mo. 50; Gill v. Feris, 82 Mo. 165; Wiggins v. C. & A., 73 Mo. 389; Mallinckrodt v. Nemnich, 83 Mo. App. 6; High on Injunctions, 2, sec. 1167.

BLAND, P. J.—Under the name of the Angelica Company, defendant, at the city of St. Louis, prior to December 16, 1903, was engaged in the business of manufacturing jackets, aprons, etc., for men engaged in certain trades. She had built up a profitable trade in said city and a considerable mail order trade in a number of States and Territories, and her goods, as the product of the Angelica Company, had gained a reputation of value. On December 16, 1903, defendant entered into the following contract with A. J. Levy:

"This agreement made and entered into by and between A. J. Levy, hereinafter called Buyer, party of the first part, and Mrs. T. D. Angelica, Everisto D. Angelica and Americo D. Angelica, hereinafter called Sellers, parties of the second part, witnesseth:

"That whereas the Sellers have heretofore been engaged in the hotel and restaurant linen supply business and of the manufacture and sale of such supplies, as well as of caps, jackets, aprons and trousers for bartenders, barbers, butchers, cooks, bakers, waiters, dentists, porters, etc., under name and style of Angelica & Co., and more lately under name and style of T. D. Angelica, and whereas they have conducted the said bus-

iness in the city of St. Louis and sold goods in the States, cities and Territories hereinafter mentioned and have built up an extensive business in the said States, cities and Territories; and, whereas, the Sellers have offered to the Buyer all of the stock, machinery, fixtures, horse and buggy, lease of No. 112 North Ninth street, in the city of St. Louis, and the entire said business, together with the good will thereof, for the price and sum of twenty-five hundred dollars ($2,500); and whereas the Sellers have offered to the buyer as a part consideration for the said twenty-five hundred dollars ($2,500) to remain out of said and similar business for a limited period of time in the places and States where said business has heretofore been conducted or goods sold; and whereas, as a part consideration of said purchase price, the Sellers have also agreed to assign to the buyer the exclusive right to use the name 'Angelica' in said or similar business; and whereas the said Buyer has accepted said offer for said price and the sum of twenty-five hundred dollars ($2,500). Now, therefore, it is mutually agreed and understood by and between the parties hereto.

"1.  That the said Sellers hereby acknowledge the receipt of said twenty-five hundred dollars ($2,500) to them, in hand paid by the Buyer.

"2.  That the Sellers hereby sell, assign, transfer, set over and convey to the buyer all of the stock, of which an inventory was taken on the fourteenth day of December, 1903, together with the machinery, fixtures, horse and wagon, lease of No. 112 North Ninth street, together with the good will of said business and the exclusive right to use the name Angelica, for the purpose of conducting said business hereafter, and give and grant to the Buyer or his assigns the right to use such name in said business, either with the initials T. D. or in connection with his own name or that of any other person, or to use the same in or as part of the name of

any corporation to be organized for the conduct of said business.

"3. The Sellers agree that for a period of nine years from the date hereof, they will not, either in their own behalf or in the employ of another, directly or indirectly, either jointly or severally, engage in the character of business hereby sold to the buyer, or in any like business, either in the city of St. Louis, State of Missouri, or in any of the following named States and Territories, the same being States and Territories in which business has been heretofore done by the Sellers, and in which the Sellers have built up and acquired a valuable good will which is hereby transferred to the Buyer as above set out, to-wit:

Arkansas, Alabama, California, Colorado, Florida, Georgia, Idaho, Indiana, Indian Territory, Iowa, Illinois, Kansas, Kentucky, Louisiana, Minnesota, Missouri, Mississippi, Nebraska, New Mexico, New York, North Dakota, North Carolina, Ohio, Oklahoma Territory, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, Wyoming.

"4. The Sellers transfer all of the foregoing and guarantee the same to be free and clear from all incumbrances and claims of any kind and character whatsoever.

"The Sellers further agree, undertake and promise to secure the consent of the landlord to the assignment to the Buyer of the lease of the premises No. 112 North Ninth street, in the city of St. Louis.

"6. The said Mrs. T. D. Angelica agrees to remain with the Buyer for a period of three months from the date hereof if her health permit, assisting in said business, in consideration of her receiving rent free during said period, the second floor of the premises No. 112 North Ninth street.

"7. In consideration of all of the foregoing the undersigned Sellers jointly and severally promise and guarantee to the Buyer and his assigns that each and

all jointly and severally shall, and will, fully perform and jointly and severally abide by, comply with, and carry out the terms of this agreement."

An assignment of the lease (referred to in the contract) to Levy was procured and he immediately took possession and embarked in the business under the name of the Angelica Company, and continued therein until April 24, 1904, when plaintiff corporation was formed and took over from Levy, by assignment, the lease and business and has ever since carried on the business under the name of Angelica Company, having over its door the sign "Angelica Company." The lease of No. 112 N. Ninth street expired July 21, 1904, and plaintiff, being unable to negotiate a renewal thereof, moved its business into No. 116 N. Ninth street, about twenty-five feet north of No. 112. The evidence shows that defendant forestalled plaintiff in procuring a renewal of the lease on No. 112, and procured a lease of the premises for herself and immediately commenced the manufacture of jackets, etc., under the style of "T. D. Angelica Embroidery Company and The Western Jacket Company," and had her sign so painted and set up in front of her place of business as to lead the public to believe she had resumed her former business at the old stand. After running the business for a few months defendant sold out to J. H. Vette, the owner of the building, but was employed by Vette to manage the business. The suit is by bill in equity to enjoin the defendant from engaging in a business like that she sold Levy. The answer was a general denial. The issues were submitted to Hon. Moses N. Sale, judge of the circuit court, who found for plaintiff. Defendant appealed.

The evidence is to voluminous to be incorporated in an opinion. A full examination of it has led us to concur in the following comment on the evidence, set out in an opinion filed in the case by the learned circuit judge, to-wit:

"The evidence shows that she has trampled the contract under her feet and has knowingly and willfully disregarded, wherever it was possible for her to do so, every stipulation of the contract made by her. There is absolutely no evidence in the case worthy the name, tending to show that any advantage was taken of her or her sons in the making of the contract."

In respect to the law of the case, we approve and adopt the following from the opinion of Judge Sale:

"In the case of the Diamond Match Co. v. Roeber, 106 N. Y. 473, decided in 1887, the opinion of the court was delivered by ANDREWS, J., who stated that one of the questions presented in the case was whether the covenant of the defendant contained in the bill of sale executed by him to the Swift, etc., Company on the twenty-seventh of August, 1880, 'that he shall and will not at any time or times within ninety-nine years, directly or indirectly, engage in the manufacture or sale of friction matches, excepting in the capacity of agent or employee of said company, within any of the several States of the United States of America or in the Territories thereof, or within the District of Columbia, excepting and reserving, however, the right to manufacture and sell friction matches in the State of Nevada and in the Territory of Montana,' is void as being a covenant in restraint of trade.

"The Court says: 'The consideration of the covenant was the purchase by the Swift, etc., Co., a Connecticut corporation, of the manufactory in the City of New York belonging to the defendant, in which he had for several years prior to entering in the covenants, carried on the business of manufacturing friction matches, and of the stock and materials on hand, together with the trade, trade-marks and good will of the business, for the aggregate sum of forty-six thousand and odd dollars.'

"It is admitted by the pleadings that in August, 1880, when the covenant in question was made, that

Swift, etc., Company carried on the business of manufacturing friction matches in the States of Connecticut, Delaware and Illinois, and of selling the same in the several States and Territories of the United States and in the District of Columbia, and the defendant in his answer admits that he was at the same time also engaged in the manufacture of friction. matches in the City of New York, and in selling them in the same territory. The defendant entered into the employment of Swift, etc., Co., and remained in its employment until January, 1881. He then entered into the employment of the plaintiff and remained with it during the years 1881 and 1882. Subsequently he became superintendent of a rival match company in New Jersey and also opened a store in New York for the sale of matches other than those manufactured by plaintiff. The defendant, for his main defense, the court states, relies upon the ancient doctrine of common law, first definitely declared, so far as I can discover, by Chief Justice Parker, in the leading case of Mitchel v. Reynolds (1st P. Williams 181), and which has been repeated many times by judges in England and America, that a bond in general restraint of trade is void.

"The cases are chronologically arranged and stated by Mr. Parsons in his work on Contracts, Vol. 2, page 748, note.

" 'It is worthy of notice,' says the court, 'that most, if not all of the English cases which assert the doctrine that all contracts in general restraint of trade are void, were cases where the contract before the court was limited or partial. The same is generally true of the American cases. The principal cases in this State are of that character, and in all of them the particular contract before the court was sustained.' [Citing cases.]

"In criticising the case of Mitchel against Reynolds, the court says: 'It is quite obvious that some of these reasons (referring to the reasons given by the court for

its decision), are much less forcible now than when the Mitchel case was decided. Steam and electricity have for the purpose of trade and commerce annihilated distance, and the whole world is now a mart for the distribution of the products of industry. The laws no longer favor the granting of exclusive privileges, and, to a great extent, business corporations are practically partnerships, and may be organized by any persons who desire to unite their capital or skill in business, leaving a free will for all others who desire for the same or similar purposes to clothe themselves with a corporate character. The tendency of recent adjudication is marked in the direction of relaxing the rigor of the doctrine that all contracts in general restraint of trade are void, irrespective of special circumsances. Indeed, it has of late been denied that a hard and fast rule of that kind has ever been the law of England.' [Rousillon v. Rousillon, 14 L. R. Ch. Div. 351.]

"The law has for centuries permitted contracts in partial restraint of trade, when reasonable, and in Horner v. Graves, 7 Bing. 735, Chief Justice TINDAL considered a true test to be whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given and not so large as to interfere with the interest of the public. 'When the restraint is general (ANDREWS, J.), but at the same time is co-extensive only with the interests to be protected and with the benefit meant to be conferred, there seems to be no good reason why as between the parties the contract is not as reasonable as when the interest is partial and there is a corresponding partial restraint. And is there any real public interest which necessarily condemns the one and not the other? It is an encouragement to industry and to enterprise in building up a trade that a man shall be allowed to sell the good will of the business and the fruits of his industry upon the best terms he can obtain. If his business extends over a

continent, does public policy forbid his accompanying the sale with a stipulation for restraint co-extensive with the business he sells? If such a contract is permitted, is the seller not more likely to become a burden on the public than a man who, having built up a local trade only, sells it, binding himself not to carry it on in the locality? · Are the opportunities for employment and for the exercise of useful talents so shut up and hemmed in that the public is likely to lose a useful member of society in the one case and not in the other? Indeed, what public policy requires is often a vague and difficult inquiry.'

"It is clear that public policy and the interests of society favor the utmost freedom of contracts within the law and require that business transactions should not be trammeled by unnecessary restrictions.

"On page 483, the court continues as follows:

" 'To the extent that the contract prevents the vendor from carrying on the particular trade, it deprives the community of any benefit it might derive from his entering into competition. But the business is open to all others, and there is little danger that the public will suffer harm from lack of persons to engage in a profitable industry. Such contracts do not create monopolies. They confer no special or exclusive privilege. If contracts in general restraint of trade, where the trade is general, are void as tending to monopolies, contracts in partial restraint where the trade is local are subject to the same objection, because they deprive the local community of the services of the covenantor in the particular trade or calling and prevent his becoming a competitor with the covenantee. We are not aware of any rule of law which makes the motive of the covenantee the test of the validity of such a contract. On the contrary we suppose a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if sup-

ported by a consideration, will depend upon its reasonableness as between the parties.'

In Whitaker v. Howe, 3 Beav. 383, a contract made by a solicitor not to practice as a solicitor in any part of Great Britain was held valid.

"In Rousillon v. Rousillon, supra, a general contract not to engage in the sale of champagne without limit as to the space was enforced as being under the circumstances a reasonable contract.

"The court also cites other cases, among them the case of Oregon Steam Co. v. Winsor, 20 Wall. 64, in which the Supreme Court of the United States enforced a covenant by the defendant made on the purchase of a steamship that it should not be run or employed in the freight or passenger business upon any waters in the State of California for a period of ten years.

" 'In the present state of the authorities,' says ANDREWS, J., 'we think it cannot be said that the early doctrine that contracts in general restraint of trade are void, without regard to circumstances, has been abrogated. But it is manifest that it has been weakened, and the foundation upon which it was originally placed, has, to a considerable extent at least, by the change of circumstances been removed.

"The covenant in the present case is partial and not general. It is practically unlimited as to time, but this, under the authorities, is not an objection if the contract is otherwise good. It is limited as to space, since it excepts the State of Nevada and Territory of Montana from its operation, and, therefore is a partial and not a general restraint, unless as claimed by the defendants, the fact that the covenant applies to the whole of the State of New York constituted a general restraint within the authorities.'

"In discussing the question whether the fact that the covenant applies to the whole State constituted

within the meaning of the authorities a general restraint of trade, the court says:

" 'We are of the opinion that the contention of the defendant is not sound in principle and should not be sustained. The boundaries of the States are not those of trade and commerce and business is restrained within no such limit. The country as a whole is that of which we are citizens, and our duty and allegiance are due both to the State and the nation. Nor is it true as a general rule that a business established here cannot extend beyond the State, or that it may not be successfully done outside of the State. There are trades and employments, which from their nature are localized; but this is not true of manufacturing industries in general.

"We are unwilling to say that the doctrine as to what is a general restraint of trade depends upon the State lines, and we cannot say that the excepting of Nevada and Montana was colorable merely. The rule, itself, is arbitrary and we are not disposed to put such a construction upon this contract as will make it a contract in general restraint of trade when upon its face it is only partial.'

" 'We are of opinion,' says the court, 'that the covenant being supported by a good consideration, and constituting a partial and not a general restraint, and being, in view of the circumstances disclosed, reasonable, is valid and not void.'

"The court then considers briefly the question of equitable jurisdiction to enforce the covenant by injunction and concludes with the right of relief by injunction as well established.

"In a note to the foregoing case in the American Cases on Contracts, by Huffcut and Woodruff (2 Ed. 1901), the Professors of Cornell University College of Law, quote from PECKHAM, J., in Mathews v. The Associated Press, 136 N. Y. 333, as follows:

" 'The latest decisions of the courts in this country

and in England show a strong tendency to very greatly circumscribe and narrow the doctrine of avoiding contracts in restraint of trade. The courts do not go to the length of saying that contracts which they now would say are in restraint of trade, are nevertheless, valid contracts and to be enforced; they do however now hold many contracts not open to the objections that they are in restraint of trade, which a few years back would have been avoided on that sole ground both here and in England. The cases in this court, which are the latest manifestations of the turn in the tide are cited in the opinion in this case, and are Diamond Match Co. v. Roeber, 106 N. Y. 473; Hodge v. Sloan, 107 N. Y. 244; Leslie v. Lorillard, 110 N. Y. 519.'

"Justice PECKHAM was the only dissenter in the Diamond Match Co. case.

" 'While the law to a certain extent tolerates contracts in restraint of trade or business when made between vendor and purchaser and will uphold them, they are not treated with special indulgence. They are intended to secure to the purchaser of the good will of a trade or business a guaranty against the competition of the former proprietor. When this object is accomplished it will not be presumed that more was intended.' [MAYNARD, J., in Greenfield v. Gilman, 140 N. Y. 168.]

" 'In the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy. This subject is much considered and the authorities cited in Transportation Company v. Pipe Line Co., 22 W. Va. 600; Gas Co. v. Gas Co., 121 Ill. 530; Telegraph Co. v. Telegraph Co., 65 Ga. 160.' FULLER, C. J., in Gibbs v. Gas Co., 130 U. S. 396.

"In the cases last cited it is apparent from the very names of the corporations engaged in the litigation that

the business involved was of such a nature that any restraint put upon it whatsoever was a prejudice to the public interests and as is well settled in cases of that character, the courts would decline on the ground of public policy to enforce a covenant in restraint of such a trade. In the use of gas, water, light or telegraph or telephone, and businesses of similar character, the courts will properly refuse to enforce restraining covenants.

"It is evident from the foregoing incomplete and unsatisfactory resume of authorities that the cases are in hopeless conflict. The Massachusetts cases cannot be reconciled with the recent decisions of the Supreme Court of the United States or of the Supreme Court of New York.

"In the case of Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, which involved the construction of an agreement between gas companies both of which were exercising public franchises, as stated by the court, it was an agreement for the abandonment by one of the companies of its discharge of its duties to the public. The supplying of illuminating gas is a business of a public nature to meet a public necessity. It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by an individual effort (citing cases, among others, St. Louis v. St. Louis Gas Light Co., 70 Mo. 69). 'Hence,' continues the court, 'while it is justly urged that those rules which say that a given contract is against public policy, should not be arbitrarily extended so as to interfere with the freedom of contract, yet, in the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy. (Citing cases.)

"In criticising the leading case of Mitchel against Reynolds, 1st P. Wms. 181, the Court says: 'The decision in that case was made under a condition of things and state of society different from those which now prevail, and the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is whether, under the particular circumstances of the case, and the nature of the particular contract involved in it, the contract is or is not unreasonable.'

"To the same effect is the opinion of BRADLEY, J., in the Navigation Co. against Winsor, 87 U. S. 64, in which the following language occurs; 'Cases must be judged according to their circumstances and can only be rightly judged when the reasons and grounds for the rule are carefully considered. The two principal grounds upon which the doctrine is founded that a contract in restraint of trade is void as against public policy, are: 1st, the injury to the public by being deprived of the restrained party's industry; second, the injury to the party himself, by being precluded from pursuing his occupation, and thus preventing him from supporting himself and family.

"It is evident that both these evils occur when the contract is general, not to pursue one's trade at all, or not to pursue it in the entire realm or country. The country suffers the loss in both cases. And the party is deprived of his occupation, or is obliged to expatriate himself in order to follow it. A contract that is open to such a grave objection is clearly against public policy, but if neither of these evils ensue, and if the contract is founded on a valid consideration and a reasonable ground of benefit to the other party, it is free from objection and may be enforced.'

The case of Leslie v. Lorillard et al., 110 N. Y. 519, GRAY, J., in delivering the opinion of the court, says: 'The tendency of modern thought and of the decisions has been no longer to uphold in its strictness the doctrine which formerly prevailed in respect to agreements in restraint of trade. The severity with which such agreements were at first treated became more and more relaxed by exceptions and qualifications. This change was gradual, and may be considered perhaps as due mainly to the growth and spread of the industrial activities of the world, and to enlarged commercial facilities, which render such agreements less dangerous as tending to create monopolies. The earlier doctrine, of course, obtained in respect to agreements between individuals. The limitations which became imposed was that the agreement should operate as to a locality and not as to the whole land. In later times the danger in such agreements seems only really to exist when corporations are parties to them, for their names and strength would better enable them to buy off rivalry and to create monopolies. The object of government, as interpreted by the judges, was not to interfere with the free right of man to dispose of his property or of his labor; it was to protect society of which he was a member, from the injurious consequences of his agreement; whether they would arise from his own improvidence in bargaining away his means of gaining a livelihood, or in the deprivation to society of the advantages of competition in skilled labor. At the present day there is not that danger, or, at least, it does not seem to exist to an appreciable extent, except, possibly as suggested in the case of corporations.'

"The court continues, on page 534: 'Under the authority of the Diamond Match Co. case, supra, it may be said that no contracts are void as being in general restraint of trade, whether they operate simply to prevent a party from engaging or competing in the same

business.' It is there said: 'To the extent that the contract prevents the vendor from carrying on the particular trade, it deprives the community of any benefit it might derive from his entering into competition. But the business is open to all others, and there is little danger that the public will suffer harm from lack of persons to engage in a profitable industry. Such contracts do not create monopolies. They confer no special or exclusive privileges.'

"In this State, as early as 1853, in the case of Presbury v. Fisher et al., 18 Mo. p. 50, the facts were that the defendants were publishers of the 'Counterfeit Detector.' The plaintiff purchased the interest of the defendants in the paper and for valuable consideration they bound themselves that neither they nor Clark (the then editor of the paper), should thereafter be engaged in the business of publishing any such paper. There was a breach of the bond and suit was instituted in which the plaintiff recovered a verdict, and the judgment was arrested on the ground that the bond was void as being in restraint of trade.

"Scott, J., in delivering the opinion of the court, says: 'There is nothing so important in the rule of law that avoids contracts in restraint of trade, that should render null an obligation made for a valuable consideration to another, on the condition that a third person should not carry on a particular trade. There is no practical man who would not smile at the conceit that the public welfare would sustain an injury by enforcing an obligation like that involved in the present case. The liberality of our laws in suffering every man to engage in any trade or occupation he may think best, without any previous apprenticeship, has blunted our perceptions of the utility of the principle which avoids contracts made in restraint of trade.'

"In speaking of the English leading case, the court

121 App—16

observes: 'That the plea filed by the defendant was that the defendant was a baker by trade; that he had served an apprenticeship to it, by reason whereof the bond was void in law. When it is considered that formerly by an early statute in England, every person was prohibited from engaging in any trade without having previously served a long apprenticeship to it, the justice and propriety of the rule commends itself to every one. But under our laws its force is not felt. It has no hold on the respect of the community.. If there is an opening for any trade or business, how little is the community affected by the agreement of one that another should not engage in it, when it is free for all others?'

"It is evident from the reasoning of the court in the Presbury case that our own Supreme Court refused to follow the Mitchel case long before the courts in New York, and the reasoning in that case, it seems to me, in this day and generation is unanswerable. Although the court admits for the sake of argument, that the bond was ineffectual or might be considered ineffectual or void as to Fisher and Bennet, it is too clear for dispute that, if necessary to uphold its decision, the court would not have hesitated to declare the bond enforcible in its full terms. The reasoning of the court to my mind demonstrates that conclusion.

"In the case of Gill v. Feris, 82 Mo. l. c. 165, the court, answering the contention that the contract is void, says: 'It will be observed that the restraint imposed upon defendant is not that he would not at any time or at any place engage in the line of business he had been conducting, but only,' etc.

"It is true in the Gill case, the contract was limited in time and place.

"In the case of Wiggins Ferry Co v. C. & A. Ry. Co, reversing the same case on appeal from the St Louis Court of Appeals, the Supreme Court, in 73, Mo., page 389, in its opinion, in discussing the contract, says:

'It was no concern of the public what particular ferry should be employed by defendant as an instrumentality for the prompt passage over the river of all freight and passengers requiring such transit, provided the one employed was in all respects sufficient to accomplish such .purpose, without imposing any additional burdens on the shipper.'

" 'This restriction,' says the court, 'is not general as to space, but only partial and special, and it is only when a contract is granted for general restraint of trade that it will be held illegal and void; but is otherwise if the restraint be partial and reasonable.   The salutary rule that a contract against public policy or interest will be enforced was adopted to conserve the best interests of society and the State, and the party who invokes it as a shield behind which to hide and protect himself against the damages attachable to the breach of a contract—especially when such party is in full and free enjoyment of all the fruits of the contract—must make it clearly manifest to the mind of the court that the obligations imposed by it are condemned by the rule.'

"In the Mallinckrodt Chemical Works against Nemnich, 83 Mo. App. page 6, the court cites, among other cases, the Diamond Match Co. case, 106 N. Y. page 473: 'Where there are special circumstances rendering the restriction reasonable and useful, and the promisor is not restrained more than is needful for the protection of the promisee, a contract in restraint of trade supported by a valid consideration will be upheld; and the reasonableness of the limitation as to space will be judged by the extent of the territory which the trade takes in and of the nature of the articles to which the restraint applies.'

"Considering the liberal trend which our Supreme Court took in probably the first case which came before it upon this subject, it is not at all surprising that

the Supreme Court and the Court of Appeals in the vast majority of cases which have come before them have sustained the validity of all contracts which would undoubtedly have been condemned by the leading English case, and the courts of this country which have followed it.

"The best statement of the rules of law relating to contracts in restraint of trade, in my opinion, is to be found in High on Injunctions, Vol. 2, sec. 1167, wherein the author states that: 'The law upon the subject has undergone three distinct stages of development: The earlier doctrine regarded all contracts restricting one in the exercise of his trade or profession as contrary to public policy and void whether the restriction was total or partial; the second or intermediate stage was that in which the courts, while still holding contracts in general restraint of trade to be void, yet recognized the validity of such agreements when the restraint was only partial, being limited as to the conditions of time and space, reasonable in its nature and founded upon sufficient consideration and in such cases relief by injunction has been freely granted to prevent a breach of the understanding. The third, and what may be termed the existing state of the law, as deduced from the latest English and American authorities, is that which recognizes and enforces covenants of this nature, even though the restraint is general throughout an entire State or country, provided it is founded upon a sufficient consideration and is not unreasonable in view of the nature and extent of the business of the covenantee. The present tendency of the courts is to construe and to enforce such contracts with reference to the wider scope and area of business enterprises as extended by the agencies of steam and electricity in modern times. If, therefore, the restrictive covenant is no broader then the nature and necessities of the business in question, and affords no more than a reasonable protection to the covenantee,

the courts now freely extend relief by injunction, even though in many cases the covenant is not limited in area.' "

The contention, that defendant was doing nothing more than following her trade as a jacket maker for wages, is not borne out by the evidence. Defendant set up the business, procured the signs painted and so placed in front of her place of business as to lead her former customers to believe the old Angelica Company was continuing its business, and her presence as manager and saleswoman confirmed the impression sought by her to be made, and resulted in a loss of trade to plaintiff. There is no getting away from the conclusion, that until restrained by the order of the circuit court, defendant was not engaged in merely earning wages but in the management of a business she covenanted not to engage in for a period of nine years.

The judgment is affirmed.    All concur.